No. 29,635.

The State of Kansas, *Appellee,* v. Mrs. F. H. Wheat and Donald Wheat, *Appellants.*

(292 Pac. 793.)

Opinion filed November 8, 1930.

*S. S. Alexander,* of Kingman, for the appellants.

*William A. Smith,* attorney-general, *R. O. Mason,* assistant attorney-general, and *Paul R. Wunsch,* county attorney, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The defendants, mother and son, were convicted on two counts for violations of the prohibitory law.

The state's evidence tended to show that the mother owned and personally conducted a drug store in the little town of Zenda, in Kingman county. Her son, a lad of seventeen, who was a student in pharmacy, assisted her in its management. They employed several clerks to assist in selling goods to customers during the Christmas season. Among the articles of merchandise kept for sale and sold by defendants was a certain bottled decoction named California Padres Wine Elixir. The state's evidence tended to show that it contained 25 per cent of alcohol and was intoxicating; that deliveries of three and four cases of this elixir were made at defendants' drug store every few days; that many empty bottles which had contained this elixir were scattered along the roads leading out of Zenda; and that a local toper was accustomed to use it as a beverage, and that his daughter had protested to one of these defendants against its sale to him.

Defendants' first objection to the judgment is that it was error to permit evidence to be introduced touching the fact that John Schulte, a local toper, was drunk at his home on August 10, 1929. It is insisted that his intoxication was caused by drinking another decoction called "Midco," which he had procured elsewhere than at defendants' drug store in Zenda. But it was also shown that on that date Schulte drank a portion of a bottle of California Padres Wine Elixir, and the evidence was competent—not to prove a sale to Schulte by defendants, but to prove that this elixir was used and usable for beverage purposes. The evidence introduced to show that frequent deliveries of cases of the elixir were made at defendants' drug store likewise was competent to show that there was a big demand for it by defendants' customers, and the many empty bottles scattered along the public road and on premises near the drug store were competent and persuasive evidence that this California Padres Wine Elixir was familiarly and widely used as a beverage in that locality. (*State v. Kane,* 114 Kan. 426, 219 Pac. 281.)

Error is also assigned on the instruction given and refused. Those given told the jury that it would not be a defense on the part of defendants if the particular sales for which they were prosecuted had in fact been made by their clerks or employees, and that it would not be a defense if the sales were made without their knowledge that

the purchasers intended to use the elixir as a beverage. The requested instructions which the trial court declined to give would have told the jury that if the sales were made in good faith and without knowledge on the part of defendants that the elixir was to be used as a beverage defendants would not be guilty of violating the prohibitory law. The instructions given correctly stated the pertinent law and the requested instructions did not. The statute does not say, and this court has never intimated, that a vendor of intoxicating liquor would be exempt from the pains and penalties of the crimes act if he did not know that the purchaser intended to use the liquor for beverage purposes. Our repeated decisions are to the contrary. (*State v. Moulton,* 52 Kan. 69, 34 Pac. 412; *State v. Rennaker,* 75 Kan. 685 and citations, 90 Pac. 245; *State v. Ilgner,* 81 Kan. 203, 105 Pac. 14. See, also, *State v. Miller,* 92 Kan. 994, 142 Pac. 979, and *State v. Kane,* 114 Kan. 426, 219 Pac. 281.)

Neither can defendants escape criminal liability on the mere ground that the particular sales for which they were convicted may have been made by their clerks or employees. Over fifty years ago this court held that where a clerk of a druggist authorized to sell the merchandise kept for sale by his employer, sold intoxicating liquors as such clerk, the druggist was liable for such act of his clerk, and was properly prosecuted, convicted and fined for a violation of an ordinance. (*City of Salina v. Seitz,* 16 Kan. 143.) See, also, *State v. Skinner,* 34 Kan. 256, syl. ¶ 7, 8 Pac. 420; *State v. Falk,* 51 Kan. 298, 32 Pac. 1132. In 33 C. J. 606 the rule, supported by many citations, is thus stated:

"To sustain a conviction under the liquor laws, it is not always necessary to show that the illegal sale, or other act, was the personal act of defendant, or was done in his presence, for he may be guilty if it was done in his interest and behalf, with his authority or consent, by persons in his employment or under his control."

See, also, exhaustive note on criminal liability of master for acts of servant in 43 L. R. A., n. s., 2-44.

Another complaint of defendants pertains to certain evidence given by the city marshal, who testified:

"A. Well, I saw some boys come in [to defendants' drug store] and order something and they wrapped it up in paper and it was handed to them.

"Q. Where did the man that handed it to them get it from? . . . Did he reach up on the shelf, or where? A. Why, I didn't see him take it from the shelf, but I think so, he was behind the counter—it was behind the counter.

"Q. How did the man hand it to him? A. Well, he wrapped it up and then handed it to him around the counter.

"Q. Did he hand it over the counter? A. No. . . .

"A. Well, I saw some [boys] come out of there that had something wrapped up in paper. I didn't know what it was.

"Q. What size paper would it be? . . . A. Oh, it was about the size like these bottles are here."

It cannot be positively declared ·that this evidence had no probative value, particularly on the nuisance count for which defendants were also being prosecuted. But even if it were held that the testimony was entirely without competent, probative value, this court would be bound to hold that its introduction was quite immaterial and nonprejudicial.

Defendants next press on our attention a certain incident which occurred after the jury had deliberated on their verdict for several days. The cause had been submitted to the jury on a Tuesday evening and they began their deliberations the following morning. They continued in session all that day, that night, and the next day until 6 p. m., when they were excused until Friday morning. The jury then reconvened and continued their deliberations all.that day, that night, and Saturday until 2:40 p. m., at which time the court called the jurors into the jury box and asked if they had agreed upon a verdict. Receiving a negative reply, the presiding judge said he could not see why this jury could not determine the case as well as any other jury, that one witness had come from Washington, D. C., and he then asked the jury if they were trying to determine this case according to the law and the evidence offered on the witness stand. The jury foreman said they were. The court then stated, in substance, that the street talk was that this jury would not convict, because a lot of other folks had been selling the same kind of booze. The foreman said the jury had been trying to stay within the law and the evidence. The court then stated, in substance, that it was not the policy of the law to let any outside influence interfere with the deliberations of the jury. The jury were then directed to retire with their foreman, and as they were filing out of the jury box the attorney for defendants addressed the court and objected to the remark of the court about other persons selling the "same kind of booze" as prejudicial. About an hour later the jury were brought again into the jury box and after a question in respect to another matter had been answered, the court said:

"After the jury returned to the jury room a little while ago counsel for the defendants objected to some of the statements made by the court to the effect that the court called the contents of these bottles booze. Perhaps the

objection was well taken. The court should have said California Wine, or whatever the correct name is. By using the word 'booze,' the court didn't intend to indicate that the contents of these bottles was intoxicating and the jury will so consider it. You may retire for further deliberations."

Defendants contend that this incident and the remarks of the trial judge about the "street talk" and "same kind of booze" were highly prejudicial and tended to coerce the jury into finding a verdict against defendants; and that the error was not cured by the court when it later advised the jury of the objection of counsel to the court's reference to the elixir as a kind of booze, and that "perhaps the objection was well taken."

The court's observation to the jury, coming as it did after it had unsuccessfully labored for nearly four days to reach a verdict, was not very discreet; and in this. appeal it furnishes a plausible talking point that it was bound to constrain the jury to return a verdict of guilty whether intended to have that effect or not. After mature reflection this court is not inclined to attach so much importance to what was obviously a mere casual observation; and as the court recalled the jury shortly afterwards and told them of defendants' objection to it and sustained that objection and expressly disavowed any purpose to influence their verdict, this court cannot discern any prejudicial consequence which can be traced to the court's utterance. If this record provoked in the minds of this court any doubt about the guilt of defendants—but it does not—the incident just discussed would present a graver question, but under the admonition of the criminal code which forbids the disturbance of verdicts and judgments for nonprejudicial irregularities (R. S. 62-1718) the present judgment will have to stand.

The judgment is affirmed.

JOCHEMS, J. (dissenting): I feel impelled to disagree with the majority opinion upon the question of whether or not the remarks of the trial court made on the afternoon of the day the verdict was finally reached constituted prejudicial error.

The length of time the jury had been deliberating on the case is stated in the majority opinion. Considering the nature of the case, the jury had spent an unusually long time in endeavoring to reach a verdict and were apparently hopelessly divided when they were called in by the court on the Saturday afternoon on which the verdict was reached. The trial judge called the jury before him and then, as the record in this case shows, he stated in substance

that he could not see why this jury could not determine the case as well as any other jury; that at least there was one witness from Washington, D. C., or a great distance; that the street talk was that this jury would not convict because a lot of other folks had been selling the "same kind of booze."

It is true that the court followed this statement by telling the jury that it was not the policy of the law to let any outside influence interfere with the deliberations of the jury.

Our legislature, knowing the frailty of human nature and having in mind some of the weaknesses of the jury system, desiring to strengthen, safeguard and protect it, enacted R. S. 60-2911, which provides:

"When the case is finally submitted to the jury, they may decide in court, or retire for deliberation. If they retire, they must be kept together in some convenient place under charge of an officer until they agree upon a verdict, or be discharged by the court, subject to the discretion of the court to permit them to separate temporarily at night, and at their meals. The officer having them under his charge shall not suffer any communication to be made to them, or make any himself except to ask them if they are agreed upon their verdict, unless by order of the court; and he shall not before their verdict is rendered communicate to any person the state of their deliberations, or the verdict agreed upon."

It also enacted R. S. 60-2912, which reads:

"If the jury are permitted to separate, either during the trial or after the case is submitted to them, they shall be admonished by the court that it is their duty not to converse with, or suffer themselves to be addressed by, any other person on any subject of the trial, and that it is their duty not to form or express an opinion thereon until the case is finally submitted to them, and that such admonition shall apply to every subsequent separation of the jury."

The purpose of the foregoing sections is manifest. It is to prevent outside interference or influence in any way making contact with and contaminating the jury. Among other things it is to prevent "street talk" from reaching the ears of the jurors.

It is elementary that in order to have a proper trial the jury must be held to a consideration of the case solely upon the evidence as admitted during the process of the trial and upon the law as given to it in the instructions of the court. They are not in any manner to be influenced by what may appear in the newspapers or by what people who are not witnesses may say concerning the case on trial. Every precaution should be taken during the course of the trial to so safeguard the proceedings that the jury in its deliberations will not in any way be influenced by extraneous matters.

This being the underlying policy of our law, the duty of the

trial court to carry out this purpose and to assist the jury in reaching a fair and impartial verdict by keeping the jury free from outside influences becomes a sacred one.

The writer can sympathize with a trial judge who has gone through a tedious trial in a case of this nature and who is then confronted with the possibility that the trial may result in a "hung" jury. He can appreciate the anxiety of the trial judge that a verdict should be reached and the case decided one way or the other by the jury. At the same time, the duty of the trial judge is clear that he should not in any manner say or do anything which will drive the jury to a decision. They should be left to their own independent judgment and if that independent judgment of each and every individual juror results in a "hung" jury, then he must simply exercise proper patience and go about the business of trying the case over again in order that justice may be done to the parties concerned.

To my mind the statement of the trial judge brought a verdict from the jury which otherwise would never have agreed. It may well be that the very issue upon which this jury was divided was the question of whether or not this California Wine Elixir was in fact intoxicating.

The record shows that the state introduced a chemist who testified that the preparation contained 25 per cent alcohol and that it was intoxicating. On the other hand, the record also shows that the witness McIntyre, who appeared in behalf of defendants, was a consulting chemist for the California Medicinal Company, the makers of the California Wine Elixir. It showed that he was a graduate chemist and had had nine years of experience as a chemist in the service of the United States government in connection with the administration of the pure-food laws; that he had been with this company since leaving the government service in 1924. This witness testified that the formula for the wine elixir was such that it was unfit for use as a beverage; that it was intended as a tonic; that the use of it in an excessive quantity would cause a normal person to become sick and nauseated and cause him to vomit; that it could not be used as a beverage by a normal human being. Here the jury had before it two well-qualified witnesses—one of whom said the preparation could be used as an intoxicating beverage and the other of whom took the opposite view.

What would be the natural effect upon a jury under this situation, where they had been divided as long as they had in this par-

ticular case, for the court to make a statement that "the street talk is that this jury will not convict because a lot of other folks have been selling the same kind of booze"?

The writer feels that the subsequent statements of the trial judge to the effect that the jury should not consider anything except the law and the evidence were unavailing to efface from the minds of the jurors the impression which must have been created by the re- marks above noted. Nothing that the court could subsequently say could obliterate his original statement.

The trial judge occupies a high position. He presides over the trial. The jury has great respect for him. They can be easily influenced by the slightest suggestion coming from the court, whether it be a nod of the head, a smile, a frown, or a spoken word. It is therefore imperative that the trial judge shall conduct himself with the utmost caution in order that the unusual power he possesses shall not be abused.

Juries are composed of human beings. They are drawn from the body of the county and therefore, notwithstanding assertions to the contrary made by some critics of the jury system, it necessarily follows that they are composed of citizens of average intelligence. It is going too far to assume that they are so dumb that improper statements made in their presence do not make any impression on their minds and therefore cannot be prejudicial. On the other hand, it is entirely too much to assume that if an improper statement has been made in their presence and they are told to disregard it, they are so highly intelligent as to be able to proceed with their deliberations and erase such statements entirely from their minds and not be influenced by them. Jurors are not skilled lawyers or judges. They cannot be expected to make the fine distinctions required to shut out from their minds prejudicial or improper statements and thus be exact and impartial judges of their fellow men. Even a judge who has been trained in the law and who knows its niceties and refinements oftentimes finds difficulty in staying within the record and basing his decision solely thereupon, uninfluenced and unprejudiced by some bit of information or knowledge which he may have obtained about the case which does not appear in the record. In the language of one of the columnists of the day, it is well to remember that "we're all human at that."

While I know the learned judge in this case is the very soul of honor and did not intend to prejudice the jury nor in any manner

improperly influence it, yet I feel that prejudice to the rights of the defendants necessarily resulted from the statements made.

As to the other specifications of error urged by the appellants, I concur in the majority opinion, but on this one specification I cannot do so. I feel that the statements of the court constituted prejudicial error and that the case should be reversed.