No. 100,824

STATE OF KANSAS, *Appellee*, v. LUTHER KEMBLE, *Appellant*.
(238 P.3d 251)

Opinion filed September 3, 2010.

*Carl Folsom, III*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: Luther Kemble directly appeals his conviction for aggravated indecent liberties with a child under age 14, for which he received a hard-25 life sentence. Kemble claims he is entitled to a new trial, based on: judicial misconduct; prosecutorial misconduct; the State's failure to charge the age element of the enhanced

offense; the district court's failure to instruct the jury to find the element of the defendant's age; and cumulative trial errors. Additionally, he contends the district court abused its discretion in denying his motion for a downward durational departure sentence. Finding that cumulative error prejudiced Kemble's right to a fair trial, we reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL OVERVIEW

On the night of the incident giving rise to the charges against Kemble, he was drinking and playing cards with his cousin, Alfred Gallardo, Jr., at the home of Gallardo's girlfriend, Ayanna. Others present included the children of Ayanna and Gallardo: their 8-year-old daughter M.S. and an infant daughter. Ayanna believed that Kemble was already intoxicated when he arrived at her apartment. Kemble said he had been drinking and taking drugs for most of that day.

At some point, the other adults left Kemble alone at the apartment with M.S. and the infant for approximately 20 minutes. When Gallardo and Ayanna returned, M.S. related that Kemble had touched her inappropriately. Specifically, M.S. said that she was attempting to make a bottle for her infant sister, but could not get the top off of the bottle. She asked Kemble for assistance, and he grabbed the bottom of her shirt to use on the bottle top. Then, he reached under M.S.'s shirt and touched her breast, both over and under her brassiere. M.S. also reported that Kemble asked for a kiss and slapped her on the buttocks.

Upon learning of the alleged abuse, Ayanna and Gallardo confronted Kemble and the situation escalated into a loud and heated argument, which a neighbor overheard and called 911. The argument was still in progress when the police arrived at the apartment. After receiving an on-the-scene explanation of what had transpired, the officers arrested Kemble and took Ayanna and M.S. to the police station for a more formal investigative interview.

During her police station interview with Detective Bostick, M.S. relayed essentially the same information, except that she clarified that Kemble had actually grabbed her breast and squeezed it. She also reported that Kemble was acting "weird," yelling at what she

thought was the television in her mother's bedroom. During the interview M.S. explained that she knew the difference between the truth and a lie and that she had lied to her mother twice before. She stated that "this is the last time."

Gallardo testified at trial that a few days after the incident, M.S. recanted her story and told him that Kemble had only tried to open the bottle with her shirt and that she had gotten scared. To the contrary, M.S.'s trial testimony was that she had not spoken to either her mother or Gallardo about the incident after the night it happened.

The complaint, charging Kemble with aggravated indecent liberties with a child under age 14, did not allege that Kemble was 18 years of age or older at the time the events occurred, although the complaint's caption included Kemble's year of birth, and the statutory citation for the crime identified the charge as being an off-grid person felony.

M.S. had difficulty testifying at trial. At times, she did not speak clearly and loudly enough to be heard by the jury. During her first direct examination by the State and her first cross-examination by the defense, M.S. did not testify that Kemble had touched or grabbed her breast. When first asked what Kemble had done after opening the bottle, M.S. replied, "Nothing." Her primary response to questions that were critical to the State's case was "I don't remember." On several occasions throughout M.S.'s testimony, the trial judge interrupted or interjected, *sua sponte*, to admonish, encourage, or question M.S., as will be related in more detail below. The State conducted redirect examination, followed by the defense's recross-examination, followed by further redirect, and finally further recross. Ultimately, on further redirect examination, M.S. said that Kemble had touched her, and in response to the trial judge's request that she show the jury where she was touched, M.S. pointed to her breast area.

Kemble's primary defense was that he could not have formed the requisite sexual intent due to voluntary intoxication. He testified that he could not remember the events with M.S. that evening because of a blackout from drinking; he said he regularly experi-

enced such blackouts. The jury apparently rejected the defense and convicted Kemble as charged.

Thereafter, Kemble filed a motion for judgment of acquittal and for a new trial. He argued that the prosecutor committed misconduct during closing argument by improperly commenting on Kemble's post-*Miranda* silence, in derogation of the holding in *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). After a hearing, the court overruled the motion.

At sentencing, Kemble argued for, but was ultimately denied, a downward departure; he was sentenced to a mandatory hard-25 life imprisonment sentence. Kemble filed this direct appeal, and we assumed jurisdiction pursuant to K.S.A. 22-3601(b)(1).

## JUDICIAL MISCONDUCT

First, Kemble contends that the trial judge's participation in M.S.'s examination was tantamount to the judge commenting on M.S.'s credibility, which prejudiced Kemble's substantial rights and denied him a fair trial. Kemble acknowledges that he did not contemporaneously object to the judge's interruptions or questions, albeit we note one instance where defense counsel sought to foreclose further judicial questioning. Nevertheless, we have previously reviewed allegations of judicial misconduct despite the lack of a contemporaneous objection, when the defendant claims a violation of his or her right to a fair trial. *State v. Tyler*, 286 Kan. 1087, 1090, 191 P.3d 306 (2008); *State v. Brown*, 280 Kan. 65, 70, 118 P.3d 1273 (2005).

*Standard of Review*

We exercise unlimited review of the particular facts and circumstances of each case to determine whether judicial comments, other than jury instructions, rise to the level of judicial misconduct. The complaining party has the burden to establish that misconduct occurred and that the misconduct prejudiced the party's substantial rights. " 'If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial.' " *Brown*, 280 Kan. at 70 (quoting *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 [2002]).

*Analysis*

Kemble contends that the trial judge's numerous comments during M.S.'s testimony implied that M.S. was lying when she testified that she did not remember the critical events, but that M.S. was telling the truth when she testified favorably for the prosecution. The State counters that the trial judge was simply helping M.S. to "sit up straight; speak loudly; answer the attorney's questions; say when she could not remember something; and tell the truth."

We have read, reread, and thoroughly reviewed the entire transcript of M.S.'s testimony in order to put the judge's comments into context. Before we recite and discuss portions of that transcript, it might be well to review a judge's role in a jury trial.

"The trial judge is not merely a moderator, but is the governor of the trial." *State v. Hamilton*, 240 Kan. 539, 545, 731 P.2d 863 (1987). As such, the trial judge "must strive to have the trial conducted in an atmosphere of impartiality and should refrain from remarks or conduct that may injure a litigant. [Citation omitted.]" 240 Kan. at 545. In that regard, a trial judge should be cognizant that jurors afford the presiding judge a great deal of respect and " 'can be easily influenced by the slightest suggestion coming from the court, whether it be a nod of the head, a smile, a frown, or a spoken word.' " 240 Kan. at 545 (quoting *State v. Wheat*, 131 Kan. 562, 569, 292 Pac. 793 [1930] [Jochems, J., dissenting]). Decades ago, this court warned:

"A juror is prone to watch any indication by the judge as to how he regards any part of the testimony or the credibility of a witness and for that reason a trial judge must scrupulously avoid the slightest indication as to his personal feelings concerning the matter in issue." *State v. Winchester*, 166 Kan. 512, 518, 203 P.2d 229 (1949).

On the other hand, "a trial court must control the proceedings in all hearings and trials and . . . has broad discretion and leeway in doing so." *Hamilton*, 240 Kan. at 547. Moreover, this court has permitted a trial judge to examine witnesses based upon the premise that one of the functions of a trial judge is to accomplish the full development of the truth. *State v. Hays*, 256 Kan. 48, 51, 883

P.2d 1093 (1994). However, even where affirming an examination from the bench, we have cautioned:

" 'If a trial judge believes that additional information should be obtained from a witness in order to clarify the evidence and enable the jury to arrive at the true facts, the better practice is for the trial judge to discuss the matter with counsel outside the presence of the jury and request counsel to pose the questions to the witness.' " *Hays*, 256 Kan. at 52 (quoting *State v. Boyd*, 222 Kan. 155, Syl. ¶ 2, 563 P.2d 446 [1977]).

If a trial judge eschews the better practice and examines a witness in front of the jury, the examining judge " 'must exercise great care to prevent giving the jury the impression that [the judge] is biased against the defendant and [the judge] must not forget the function of a judge and assume that of an advocate.' " *Hays*, 256 Kan. at 52 (quoting *Boyd*, 222 Kan. 155, Syl. ¶ 1).

Turning to the transcript, we note that the trial judge injected herself into M.S.'s examination almost immediately. After the prosecutor began the first direct examination by asking M.S. her name, the following exchange took place:

"THE COURT: Oh, wait a minute here. Let me see something here. I would bet anything, looking at this girl, that when she's outside, when somebody's trying to sleep, that nobody gets any sleep because she can be as loud as she wants to be. Would I be right?

"[M.S.]: No.

"THE COURT: Okay. Well, let's practice being louder on that. You're almost whispering. So just use a—use a loud voice. Let me hear your regular voice, like when you're talking to a friend.

"[M.S.]: Okay.

"THE COURT: Better. Much better. Thank you."

Later in the direct examination, the court interrupted again, admonishing M.S. that she had reverted to using a soft voice again and indicating that M.S. was doing so because the prosecutor was using "a very soft voice." The court told M.S. to copy the judge's voice, not the prosecutor's. Once again during direct examination, the court declared that it could not hear a word that M.S. was saying and advised the prosecutor that standing next to M.S. made the witness think she was having a conversation with the prosecutor. However, rather than instructing the prosecutor to change positions in the courtroom, the court told M.S. that she was telling

her answers to the jury, apparently implying that M.S. needed to speak louder.

Up to this point, the trial judge had simply taken steps to control the proceedings in her courtroom by assuring that the jury could hear the witness. However, subsequently, the court began to get more intrusive with the substance of the testimony. When the prosecutor got to the point of trying to elicit what Kemble had done after M.S. asked him to open the baby bottle, the following exchange occurred:

"Q. Describe what he did next. What did he say?
"A. [M.S.] Nothing.
"Q. What did he do? Did he take the baby bottle?
"A. I can't remember.
"Q. . . . I want you to describe what happened that night. What did you tell your mom when she came home? Do you remember when your mom came home—when your mom and dad came home?
"A. I think I was on the couch sitting down.
"Q. Where was [the infant]?
"A. In my lap.
"Q. Why? What did you tell your mom?
"THE COURT: [M.S.], are you—are you embarrassed to answer these questions?
"[M.S.]: No.
"THE COURT: All right. Why are you not answering them?
"[M.S.]: I'm trying to remember.
"THE COURT: Okay. Well, say when you can't remember but try and remember.
"[M.S]: I can't remember."

Here, the trial judge was not addressing the manner in which M.S. was testifying, but rather the answers she was giving. Although M.S. had provided an answer to each question, the court asked why she was not answering the prosecutor's questions. A reasonable juror would infer that the judge did not believe that "I can't remember" was a legitimate answer to the prosecutor's question. That inference was reinforced the next time the trial judge intervened, during the defense's first cross-examination, which is set forth below, with emphasis added:

"Q. [Defense counsel] . . . [A]re you kind of embarrassed up there testifying?
"A. [M.S.] No.

"Q. No. You're not uncomfortable or anything?
"A. Well, a little.
"Q. [M.S.], let me ask you this. Do you remember telling Detective Bostick and telling your mom that Luther put his hand underneath your shirt?
"A. No.
"Q. You don't remember telling them that?
"A. (Witness shook head from side to side) Hum-um.
"Q. So it's possible that he didn't do that?
"[PROSECUTOR]: Objection, that's speculative.
"THE COURT: Overruled. This is cross examination. [M.S.], sit up straight and take your hands away from your chin and answer directly into the microphone, all right?
"[M.S.]: Okay.
. . . .
"THE COURT: You're a big girl and this is a big girl thing to do. So I want you to sit like a big girl and answer questions. You know, *it's not telling the truth if you say I don't remember and you do remember.* Do you understand me?
"[M.S.]: (Witness nodded head up and down) Okay.
"THE COURT: All right. Good.
"[M.S.]: Well, I remember a little bit but not all of it.
"THE COURT: Well, answer the questions that . . . [the defense] is asking then.
"[M.S.]: Okay.
"THE COURT: Thank you.
"Q. Is it possible that Luther didn't put his hand up your shirt and touch you in your chest area?
"A. I think I'm starting to remember that part.
"Q. Okay. Let me ask you this, [M.S.]. Is it possible that he maybe pushed you away or something like that?
"A. No.
"Q. That's not possible?
"A. No
"Q. Okay.
"THE COURT: *Good girl.*
"Q. So again, do you remember him trying to help you open the bottle?
"A. I think. I'm not sure.
"Q. That's okay. If you don't remember, that's okay.
"THE COURT: Ask another question, please.
"[Defense counsel]: Sure." (Emphasis added.)

This time, the trial judge's clue to the jury that M.S.'s "I can't remember" answers were not truthful was much less oblique. Her statement would intimate to a rational person that the court

thought that M.S. really did remember. The court then exacerbated the impression that it was prejudiced against the defendant by praising M.S. for her unfavorable answer to defense counsel's question. But, the court was not finished with its intervention. When defense counsel immediately returned to eliciting responses favorable to the defendant, the trial judge cut off the questioning.

During redirect examination, the court refrained from getting involved, except for one point at which the judge, noting that M.S. had reverted to talking softly, reminded M.S. to talk in the loud voice of the judge and not the soft voice of the prosecutor. However, shortly after recross-examination began, the judge jumped back into the fray:

"Q. [Defense counsel]: But you don't remember him doing anything else with his hands? [M.S.], again, if you don't remember, you can tell me you don't remember.

"A. [M.S.]: I remember some parts of it.

"THE COURT: Do you want to take a break, [M.S.]? Is this—or would you like—you know, let me just be very honest with you right now, okay. If you just say what you know and after you're done telling what you know then it's going to go faster, you'll be done, all right? I'm not asking you to say anything that isn't true. In fact, I'm ordering you to only tell what the truth is.

"[M.S.]: Okay.

"THE COURT: But sometimes just saying I don't remember, if that's not true, then that's a lie. And then—and that's not what you promised to do here. If you really don't remember, say you don't remember, okay? You are a big girl, and you have shown every time, you know, what—every time you straighten your back and sit straight up, *you give a good answer* and you talk loud and stuff like that. You are much bigger than what you're trying to be. Do you understand what I'm saying?

"[M.S.]: Yes.

"THE COURT: Thank you very much. Now would you answer his questions?

"[M.S.]: Yes.

"THE COURT: Thank you. [Defense counsel].

"[Defense counsel]: Thank you, Your Honor.

"Q.: So [M.S.], you remember him grabbing the bottom of your shirt?

"A.: Yes, and I remember that.

"THE COURT: If you want to look towards me, that would be fine. If you want to look at me when you're answering your questions, that would be fine, too.

"[M.S.]: I don't remember anything.

"THE COURT: If you don't remember, then that's the answer to give. You started to answer the question. What was her response? What did she say, I

remember some parts of it? Please tell [defense counsel] the parts that you remember.

"[Defense counsel]: But Your Honor, I think probably she did respond to my question just now by saying she didn't remember anything else. I was pretty much done with that.

"THE COURT: All right. Thank you. [Prosecutor]?"

The trial judge's offer of a break is curious, given that the completion of the State's redirect examination would have been the natural time to take a break in the proceedings, and there was no indication that the witness was experiencing emotional distress. One might note that the examination went through the remainder of the recross, as well as the further redirect and further recross, without another proffer of a break. The interruption becomes more suspect when it includes a veiled suggestion that if M.S. will just implicate Kemble, then the witness will be done testifying. Pointedly, this was the only time that defense counsel apparently felt that he could take the risk of challenging the court's intervention, albeit such assertiveness was not to resurface.

The foregoing transcript recitation was followed immediately by the prosecutor's further redirect examination, in which the trial judge apparently could not refrain from participating, as follows:

"Q. [Prosecutor]: [M.S.], you tell the Judge, you said I remember some parts of it. You said that I remember him using my shirt to try and open the baby bottle, and finish your sentence. You tell the Judge what's the rest, just tell her.

"A. [M.S.]: And I remember part, he touched me right here.

"THE COURT: He did, okay. Now, that you've told me, would you show the jury where you said he touched you?

"[M.S.]: Right here.

"[Prosecutor]: For the record, the witness is indicating on her—on her breast area."

The court then abstained from being involved in the State's remaining redirect examination of M.S. However, before the defense commenced its recross-examination, the court spoke up again to advise M.S. that she was loud when she sat up straight, specifically saying: "You notice how you talk *more convincingly* and more, you know, loud and stuff." (Emphasis added.) The court told M.S. to do the same thing for defense counsel, and further advised that "it

also will go much more faster." After the questioning was completed, the court left this final impression with the jury:

"THE COURT: Thank you, [M.S.]. Very good. I'm glad that you finally decided to answer like a big girl and I appreciate it very much. You're done testifying now. Thank you."

One can empathize with the frustration a trial judge might experience with a child witness who will not testify consistently with his or her prior statements, especially if the judge might perceive that the prosecutor's soft-spoken demeanor is impeding the search for the truth and precluding the just punishment of a perpetrator of the most despicable conduct in our society. Nevertheless, the judge cannot cross the line between being the impartial governor of the trial and being an advocate for the prosecution. The lines of demarcation separating the duties of each of the players in a criminal trial are sacrosanct, *i.e.*, the prosecutor representing the people; the defense attorney representing the accused; the trial judge representing the interpreter of the law; and the jury representing the finder of facts. If any of those lines are crossed, the system that has held this nation in good stead for two and a quarter centuries has been compromised. Here, the trial judge crossed the line, not only refusing to follow the better practice of addressing the problem with counsel outside the jury's presence, but failing to exercise the appropriate caution in questioning a witness and making comments in front of the jury.

Apparently, the court recognized the potential problem during the trial, commenting to the attorneys outside the presence of the jury that the record might read as though she had been sympathetic to the victim. The prosecutor noted some of the court's interventions, described above. The court responded that she believed her interventions had been solely for the purpose of getting M.S. to testify in a louder voice. When asked if he agreed, the defense attorney responded, "I do, Your Honor, and I also think the court was being stern with her and not babying her in any fashion."

One might view the defense attorney's comment as a waiver of the judicial misconduct complaint, because it may have prevented the trial judge from giving a cautionary instruction to the jury about

the court's participation. However, there is precedent for the proposition that one cannot assume that jurors will disregard a trial judge's improper statements just because they are told to do so. See *Hamilton*, 240 Kan. at 545; *Winchester*, 166 Kan. at 517-18 (judge's improper cross-examination of defendant reversible error, even though judge discovered his error and gave jury a corrective instruction). Moreover, combination of the judicial misconduct and the prosecutorial misconduct, to be discussed below, dictate the defendant's entitlement to a new trial.

## PROSECUTORIAL MISCONDUCT

Next, Kemble argues that the prosecutor improperly commented on his post-*Miranda* silence during closing argument, in violation of *Doyle v. Ohio,* 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). Specifically he complains that the statement, "He never said I was too drunk to remember until today," was presented in a PowerPoint slide used by the State during closing arguments. Kemble's objection at trial was overruled, and his motion for acquittal and motion for new trial on the same grounds were denied.

### Standard of Review

This court employs the familiar two-step analysis for reviewing claims of prosecutorial misconduct.

" 'First, the court must determine whether the prosecutor's statements were outside the wide latitude for language and manner a prosecutor is allowed when discussing the evidence; second, it must determine whether the comments constitute plain error, that is, whether the statements were so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. [Citation omitted.]' " *State v. Brinklow*, 288 Kan. 39, 44, 200 P.3d 1225 (2009) (quoting *State v. Scott*, 286 Kan. 54, 77, 183 P.3d 801 [2008]).

The second step addresses whether the misconduct is so prejudicial that it denies the defendant a fair trial and requires a harmlessness inquiry. *Brinklow*, 288 Kan. at 44. Three factors are considered: "(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight

in the minds of jurors." 288 Kan. at 44. No individual factor is controlling, and the third factor may never override the first two until both harmlessness tests—K.S.A. 60-261 (prosecutor's statements were inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 22, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (error had little, if any, likelihood of changing the outcome of trial)—have been met. " ' "If this can be said, then certainly it will also be true 'that the misconduct would likely have little weight in the minds of jurors.' " ' " 288 Kan. at 44 (quoting *Scott*, 286 Kan. at 79).

*Analysis*

The familiar recitation set forth in *Miranda* some 44 years ago advises a defendant that he or she has the right to remain silent and warns that if he or she chooses not to exercise the right to remain silent, then anything that he or she says can and will be used against the person in a court of law. The corollary is that if a duly warned person *does* exercise the right to remain silent, then anything that the person did *not* say, *i.e.*, the person's silence, cannot and will not be used against them in a court of law.

More specific to this case, constitutional constraints preclude a prosecutor from commenting on a defendant's post-*Miranda* silence in closing argument. Accordingly, a prosecutor may not attempt to impeach the truth of a defendant's trial testimony by implying that the defendant had a post-*Miranda,* pretrial obligation to reveal to the police or prosecutor the substance of the defendant's trial testimony. See *State v. Hernandez*, 284 Kan. 74, 94, 159 P.3d 950 (2007). Obviously, that is precisely what the prosecution did in this case by saying that Kemble was asserting his voluntary intoxication defense for the first time at trial.

The defense counsel objected to the PowerPoint statement during the closing argument, saying, "That's improper because it's his right to remain silent." After clarifying for the court the exact statement being challenged, the trial judge overruled the objection with the cursory statement, "Well, that's okay." Then, when denying the defendant's motion for new trial, the trial judge said, "[a]ll the State did was say that, you know, he had never raised this to anyone

else," and then the court opined that the State was not prohibited from making such a statement. But, of course, that is exactly the prohibition stated by *Doyle* and specifically followed in this state by *Hernandez*.

The State attempts to characterize the closing argument statement as only referring to the "defendant's failure to mention his alleged intoxication when confronted by the victim's family in the immediate aftermath of the incident." Obviously, if defendant was asserting a voluntary intoxication defense, he would be saying that he was too drunk to form a specific intent to commit the crime. Yet, the State would expect the defendant to have sufficient cognitive ability to affirmatively assert, almost contemporaneously with the criminal act, that defendant was relying on the defense of voluntary intoxication, *i.e.*, he was too drunk to know what he was doing, but not too drunk to assert his affirmative legal defenses. The argument is, at best, counterintuitive. Moreover, one of the family members was apparently able to discern Kemble's intoxication without the benefit of his declaration that he was intoxicated.

More importantly, the State's argument does not comport with the actual statement used in closing argument. The statement was: "He never said I was too drunk to remember until *today*." (Emphasis added.) "Today" was the day of trial, not the immediate aftermath of the incident. The State's attempt to rewrite the statement on appeal is unavailing. The prosecutor committed a *Doyle* violation, which is clearly outside the permissible bounds of fair comment under the first step of our analysis.

Turning to the second step of the analysis, we find that, considering the three factors, the misconduct was clear error. First, the misconduct must be considered gross and flagrant. We are not dealing with a newly announced constitutional rule of which the prosecutor may not have been aware. Some 34 years ago, *Doyle* established the basic premise that when a defendant invokes his or her right to remain silent, the State may not use that silence against the defendant at trial. Likewise, this court has not been equivocal about the rule's application to a prosecutor's closing argument. Recently, in *Hernandez*, 284 Kan. at 94, we held that the prosecutor's comments in closing argument provided "a clear implica-

tion . . . that were the defendant's testimony at trial true, he would have provided his exculpatory story after he was charged." We stated explicitly that "[s]uch implications are barred by *Doyle*." 284 Kan. at 94.

Moreover, we are not presented with a spur-of-the-moment comment delivered extemporaneously under the stress of countering a defense argument. The statement was included in the State's PowerPoint presentation to the jury. Some forethought during trial preparation could have easily avoided the constitutional violation. Even at trial, the prosecutor was put on notice of the *Doyle* violation through defense counsel's objection, notwithstanding the trial court's erroneous ruling on the objection. The decision to press forward with the statement provides at least a colorable showing of ill will on the prosecutor's part.

Finally, we cannot say that the error was obviated by evidence which was so overwhelming that the misconduct would have had little weight in the minds of the jurors. "In determining harmless error in the context of a *Doyle* violation, we consider the nature and extent of the comment in comparison with the strength of the evidence of the defendant's guilt . . . ." *State v. Murray*, 285 Kan. 503, Syl. ¶ 9, 174 P.3d 407 (2008). With respect to the State's case, the evidence hinged on the victim's credibility; there was no physical evidence to support the charge. M.S. initially said that she had lied before, but this was the last time. Her father said she recanted her accusation. At trial, but for the judge, her live testimony might well have continued to be that nothing happened. Granted, the State still had the testimony of the others to whom M.S. had previously given a statement, but that evidence cannot be characterized as direct and overwhelming.

Perhaps more prejudicial for Kemble was that the *Doyle* statement directly addressed his theory of defense, *i.e.*, voluntary intoxication. There was evidence to support the theory beyond Kemble's own declaration that he was intoxicated. The victim's mother said Kemble arrived at her house intoxicated. M.S. said Kemble was acting "weird," yelling at the television. One of the detectives noted a strong odor of alcohol on Kemble after his arrest. It might stretch one's imagination to believe that the State's implication that

Kemble's intoxication theory was not true because he had been silent about it prior to trial and the trial court's apparent stamp of approval on that implication had little weight in the minds of the jurors. Nevertheless, we will simply add this error to our cumulative error analysis.

## CUMULATIVE ERROR

Kemble argues that even if the errors he alleges on appeal do not individually support reversal, the cumulative effect of those errors denied him a fair trial. We evaluate cumulative error claims by determining " ' "whether the totality of circumstances substantially prejudiced the defendant and denied [the defendant] a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant." ' " *State v. Ellmaker*, 289 Kan. 1132, 1156, 221 P.3d 1105 (2009) (quoting *State v. Brown*, 285 Kan. 261, 305-06, 173 P.3d 612 [2007]); accord *Brinklow*, 288 Kan. at 54.

Conceivably, reasonable people might differ in their assessment of whether either the judicial misconduct or the prosecutorial misconduct in this case, when viewed in isolation, requires reversal, *i.e.*, whether the respective individual error was harmless. However, when the two errors are viewed together, the cumulative effect clearly denied Kemble his right to a fair trial. As noted above, that denial cannot be cured by declaring the evidence against the defendant to be overwhelming. Accordingly, we reverse Kemble's conviction and remand for a new trial.

## DEFENDANT'S AGE

Having determined that Kemble is entitled to a new trial on the charge of aggravated indecent liberties with a child, the other issues on appeal are moot, except to the extent that a resolution of another issue would impact any retrial. Kemble raised two issues relating to his age at the time of the offense, and he now contends our decision on those issues will dictate the severity level of the crime for which he can be retried. Accordingly, we will briefly address those issues.

Kemble was charged with aggravated indecent liberties with a child based upon an allegation that he engaged in lewd fondling

or touching of a child who was under the age of 14 years. K.S.A. 21-3504(a)(3)(A). In the statute defining the crime, specifically under K.S.A. 21-3504(c), two separate levels of the offense can apply to the act which Kemble committed, depending upon whether he was age 18 years or older at the time of the offense: one a Kansas Sentencing Guidelines Act (KSGA) nondrug grid-box offense, *i.e.*, a severity level 3 person felony; and the other an off-grid person felony. See *State v. Bello*, 289 Kan. 191, 198, 211 P.3d 139 (2009). Accordingly, "the defendant's age at the time of the offense is an element of the crime if the State seeks to convict the defendant of the more serious, off-grid enhanced offense. [Citations omitted.]" *State v. Reyna*, 290 Kan. 666, 676, 234 P.3d 761 (2010).

In his brief, Kemble claimed that the State failed to charge him with the off-grid version of the offense, because the charging document omitted the element of the defendant's age in the body of the complaint. In other words, the argument is that the complaint only charged the lesser, grid-box version of the offense, thereby depriving the court of jurisdiction to convict and sentence him for the more serious, off-grid offense. See *State v. Belcher*, 269 Kan. 2, 8, 4 P.3d 1137 (2000) (if crime not specifically stated in information or not lesser included offense of crime charged, court lacks jurisdiction to convict of the uncharged crime, regardless of evidence presented). In another issue, Kemble correctly asserted that the jury instructions omitted the element of defendant's age, and he argued that, as a result, the facts actually found by the jury beyond a reasonable doubt only supported a conviction for the lesser grid-box version of the crime. See *Bello*, 289 Kan. at 200 (remanding for resentencing the convictions as the lesser, on-grid versions of the crimes); *State v. Gonzales*, 289 Kan. 351, 371, 212 P.3d 215 (2009) (case remanded for resentencing as a felony on the KSGA nondrug sentencing grid).

Now, with respect to the mootness question, Kemble argues that because he was only convicted of the lesser grid-box offense, a reversal of that conviction precludes a retrial on the higher degree, off-grid crime. He points to K.S.A. 21-3108(5), which provides: "In no case where a conviction for a lesser included crime has been invalidated, set aside, reversed or vacated shall the defendant be

subsequently prosecuted for a higher degree of the crime for which such defendant was originally convicted." While Kemble's arguments are seductive, the premise that he was charged with and convicted of the lesser degree of the crime is not supported by a majority of this court, as reflected in its recent opinions.

With respect to his challenge to the complaint, Kemble acknowledges our decision last year in *State v. Gracey*, 288 Kan. 252, 200 P.3d 1275 (2009). In addressing essentially the same issue, *Gracey* relied on a standard for reviewing defective complaint claims which was first manufactured from whole cloth in *State v. Hall*, 246 Kan. 728, 761, 793 P.2d 737 (1990), *overruled in part on other grounds Ferguson v. State*, 276 Kan. 428, 78 P.3d 40 (2003). *Gracey* stated the relevant portion of the *Hall* rule to be as follows:

"When the charging document is challenged for the first time on appeal, the defendant must show that the alleged defect either: (1) prejudiced the defendant's preparation of a defense; (2) impaired the defendant's ability to plead the conviction in any subsequent prosecution; or (3) limited the defendant's substantial rights to a fair trial." 288 Kan. at 254.

Applying that rule, *Gracey* found that the presence of the defendant's date of birth in the complaint's caption and the statement that the crime was an off-grid person felony in the statutory citation at the bottom of the complaint were sufficient to "demonstrate that Gracey was adequately informed of both the crime charged and the penalty." 288 Kan. at 257. But *cf. State v. Sanford*, 250 Kan. 592, 601, 830 P.2d 14 (1992) ("We have held that the citation to the statute cannot substitute to supply a missing element of the charge."). The opinion then declared that Gracey "does not contend that the preparation of his defense or his rights to a fair trial were impaired, and the conviction has not been shown to affect any subsequent prosecution." 288 Kan. at 257. In effect, *Gracey* found the complaint validly charged the higher degree, off-grid version of the felony.

Here, Kemble attempts to distinguish *Gracey* by asserting that he can make a showing that he was prejudiced in the preparation of his defense and that his right to a fair trial was impaired. Kemble points out that the only specific evidence of his age was elicited by defense counsel during Kemble's direct examination. Had the de-

fense been put on notice that defendant's age was an element of the crime, the defense would not have elicited the evidence. Then, because the State failed to prove Kemble's age with any certainty, a sufficiency of the evidence claim could have been successful on appeal.

Kemble's claim that he was not put on notice that his age was an element of the crime certainly has some appeal from a practical sense. Kemble's year of birth was grouped under his name, along with the designation "W/M," the last four digits of his SSN, a KDR number, and an LEO number. For most of the world, the relevance of the year of birth in the caption would appear to be to identify the defendant, rather than to specify an element of a charge recited later in the document.

Further, here the statutory citation at the bottom reads, "K.S.A. 21-3504(a)(3)(A)(c)." Presumably, the scrivener meant to cite to both subsection (a)(3)(A) and subsection (c). Nevertheless, the citation clarifies nothing for a defendant, because both the grid-box and the off-grid crimes are described in section (c). Therefore, the complaint presents a mixed signal: the stated elements describe the grid-box version of the crime, whereas the statutory citation section states that the charge is an off-grid person felony. In other words, the prosecutor made an error in one place or the other. Is a defendant to always presume that the error is in the recitation of the elements, instead of in the identification of the severity level? Does it make any difference when the State does not put on any evidence of the omitted element during its case-in-chief, thereby suggesting that it is prosecuting the lesser decree of the crime?

Nevertheless, we need not ruminate further on a defendant's need for clairvoyance in reading a complaint. *Gracey* essentially held that an identifying year of birth in the caption and a statement at the bottom of the complaint that the crime charged is an off-grid person felony are *legally* sufficient notice to a defendant that he or she is being charged with the more serious version of the crime. 288 Kan. at 257. This court has subsequently followed that conclusion. *Reyna*, 234 P.3d at 772-73 ("While the complaint failed to include the off-grid element in the individual counts charging

the crimes, the complaint overall adequately charged him with the off-grid offenses."); *Gonzales*, 289 Kan. at 369.

Therefore, although Kemble did make a specific claim of prejudice, unlike the appellants in *Gracey*, *Gonzales*, and *Reyna*, that claim is based upon a lack of notice that his age was an element of the crime charged, which is tantamount to saying that he did not have notice that he was charged with the off-grid crime. Because essentially identical complaints have been found to be legally valid in charging the off-grid crime, *i.e.*, were found to have provided adequate notice of the missing element, Kemble's claim of prejudice cannot save his defective complaint challenge.

Next, Kemble's jury instruction argument has recently been undermined by our decision in *Reyna*, which was filed after oral arguments in this case. *Reyna* acknowledged that the district court erred in failing to instruct the jury on the element of the off-grid offense that requires the defendant to be age 18 years or older at the time of the offense. However, the opinion found, based in part on our prior decision in *State v. Daniels*, 278 Kan. 53, 91 P.3d 1147, *cert. denied* 543 U.S. 982 (2004), and the United States Supreme Court decision in *Washington v. Recuenco*, 548 U.S. 212, 165 L. Ed. 2d 466, 126 S. Ct. 2546 (2006), that the failure to instruct on an element of a crime can be subject to the harmless error rule. " '[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.' " *Daniels*, 278 Kan. at 62 (quoting *Neder v. United States*, 527 U.S. 1, 17, 144 L. Ed. 2d 35, 119 S. Ct. 1827 [1999]). Given that Reyna had testified that he was 37 years old in response to his own counsel's questioning, the *Reyna* majority found that the failure to instruct on the age element was harmless. Therefore, Reyna's conviction for the off-grid version of the offenses was affirmed, in contrast to the holding in prior cases where no evidence of age had been admitted at trial. See, *e.g.*, *State v. Morningstar*, 289 Kan. 488, 494-95, 213 P.3d 1045 (2009); *Bello*, 289 Kan. at 200; *Gonzales*, 289 Kan. at 371.

Here, Kemble testified that he was 34 years old at the time of trial, and the victim's mother testified that she thought Kemble was 31 or 32 years old. There was no other conflicting testimony that would call into doubt the fact that Kemble was over 18 years old at the time of the offense. Under the rationale of the *Reyna* majority, Kemble's conviction was for the off-grid version of aggravated indecent liberties with a child. Therefore, a retrial on that higher degree of the offense is not precluded by K.S.A. 21-3108(5).

Kemble submitted a letter of additional authority under Supreme Court Rule 6.09 (2009 Kan. Ct. R. Annot. 47), addressing *Reyna*'s impact on this case. Kemble attempted to avoid the *Reyna* result by first arguing that the United States Supreme Court got it wrong because two judicial findings of fact should not be the constitutional equivalent of one finding of fact by a jury. A majority of this court has disagreed and chosen to follow the federal precedent.

Next, Kemble points out that he made the additional argument that Section 5 of the Kansas Constitution Bill of Rights provides more protection than the United States Constitution when it declares: "The right of trial by jury shall be inviolate." The suggestion is that a violation of the right to a jury trial should be structural error under the state constitution even though it is not structural error under the federal Constitution. While Kemble's initial brief mentioned that he was claiming error under the Kansas Constitution, it did not fully develop the ramifications of interpreting our state constitution differently than the federal Constitution. Moreover, the *Reyna* majority chose not to find structural error under state law, even though *Recuenco* left open that possibility. 548 U.S. at 218 n.1; see also *Reyna*, 234 P.3d at 779 (Johnson, J., dissenting).

Finally, Kemble argues that, even if harmless error is applicable here, we should not find that the evidence supported applying it in his case. He asserts that the only specific evidence of his age was elicited by his own attorney as a direct result of the State's error in failing to charge the age element in the complaint. Therefore, Kemble contends that the State should not gain the benefit of the harmless error doctrine when it caused the problem by filing a defective complaint. There is a ring of fairness to the argument that the State should not be permitted to sandbag a defendant into

offering inculpatory evidence by omitting an element from the complaint, failing to offer any evidence on the omitted element in its case-in-chief, and then declaring "gotcha" when the defendant inadvertently and unknowingly incriminates himself or herself. Nevertheless, that is exactly what was permitted in *Reyna*, and that is the law in this state.

Reversed and remanded for a new trial.

DAVIS, C.J., not participating.
MALONE, J., assigned.