NOT DESIGNATED FOR PUBLICATION

Nos. 117,789

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LARRY W. INGRAHAM,
*Appellant*.

MEMORANDUM OPINION

Appeal from Neosho District Court; LEO T. GENSWEIDER, judge. Opinion filed July 27, 2018. Affirmed.

*John J. Gillett*, of Chanute, for appellant.

*Linus A. Thuston*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., STANDRIDGE, J., and RYAN W. ROSAUER, District Judge, assigned.

PER CURIAM:  Larry W. Ingraham was charged with misdemeanor battery after a physical confrontation with his daughter. Following a bench trial, the district court found Ingraham guilty. Ingraham appeals, claiming that the district court engaged in judicial misconduct and that there was insufficient evidence to support the conviction. For the reasons stated below, we affirm.

FACTS

On March 1, 2017, Ingraham was charged with class B misdemeanor battery in Neosho County for an incident that occurred on November 24, 2016. The case went to a

1

bench trial on May 9, 2017. The victim in this case, S.I., is Ingraham's daughter. Some years before the incident, Ingraham and S.I.'s mother were divorced. S.I. lived with her mother in another town, but at the time of the incident she came to Chanute to celebrate Thanksgiving with Ingraham's mother and sister. S.I. decided she would stop to see Ingraham while she was in town and also to retrieve some of her personal belongings from his home. S.I. traveled to Ingraham's house with her sister E.I. and K.P., E.I.'s boyfriend. E.I. and K.P. stayed in the car while S.I. went into Ingraham's home. What happened next is disputed by the testimony of the various witnesses.

S.I. testified that as soon as she entered Ingraham's house, Ingraham and his new wife began yelling at her, expressing their belief that S.I. did not treat them right. Ingraham then grabbed S.I. by the throat and physically shut her between the front door and the screen door "several times," telling S.I. either before or during "not to let the door hit [her] on the way out." In the scuffle, the new pair of jeans S.I. was wearing ripped. When S.I. broke away and got out of the home, Ingraham chased her down the steps and told her he was getting his gun. On cross-examination, S.I. revealed she did not consider Ingraham to be her father because "he doesn't ever try to show he cares."

S.I. went to the police station to report what happened. Jeffery O'Daniel, with the Neosho County Sheriff's Department, was dispatched to the Chanute Police Department lobby. O'Daniel interviewed S.I., who provided the same version of events reflected in her testimony. O'Daniel did not notice any marks on S.I.'s throat, but stated "she was red . . . on her chest." O'Daniel also noticed S.I.'s pants were ripped in the buttocks area. E.I. told O'Daniel she had, from the car, observed S.I. running from Ingraham's home with Ingraham in chase. E.I. also told O'Daniel that she heard Ingraham say he was going to get a gun. K.P. told O'Daniel the same thing: that he saw S.I. running to the car and that he heard Ingraham say he was going to get a gun.

2

After meeting with S.I., E.I., and K.P., O'Daniel went to Ingraham's home to get his version of the events. Ingraham maintained there "had been no physical contact" and had no explanation for any marks on S.I. or her ripped jeans. Ingraham told O'Daniel that S.I. had come to his house to pick up some personal belongings, and he refused her request because he believed she did not come to visit often enough. Ingraham explained that a couple months before this incident, Ingraham's father had died and Ingraham asked S.I. to attend the funeral. In response to his request, S.I. cussed at Ingraham, told him that he was dead to her, and warned him not to contact her. Ingraham told O'Daniel he was surprised to see S.I. come to his home after S.I. said these things to him only a couple months before. While they were talking, O'Daniel observed a rifle in a chair next to the front door of Ingraham's home.

At trial, E.I. testified she observed that her stepmother invited S.I. into the Ingraham home. After approximately a minute, E.I. saw S.I. being shut in between the front door of Ingraham's home and the storm door. Ingraham chased S.I. out of the home and E.I. heard him say he was getting a gun. E.I. saw "a full handprint on [S.I.'s] throat" and stated S.I. "was gasping for air." K.P. also observed S.I. being invited into the home. K.P. saw S.I. being shut in the door, saw Ingraham chase S.I. off the front porch, and heard S.I. say Ingraham was getting a gun. K.P. also observed marks on S.I.'s throat.

Ingraham and his wife Rhonda both testified at trial. Rhonda testified she and Ingraham were watching a movie when they heard a knock at the door. When they answered the door, S.I. entered the home and began demanding personal items of hers that were in the home. Rhonda described S.I. as "loud and rude and very insisting." Rhonda said Ingraham asked S.I. why he should allow her to take anything given the way she had been treating him. S.I. responded by calling Ingraham an asshole. Ingraham then asked S.I. to leave. Ingraham advised S.I. to never come back and if she did he would call the sheriff. Rhonda maintained Ingraham never touched S.I., and neither she nor

3

Ingraham chased S.I. Rhonda testified the gun near the front door had been there for three to four years.

Ingraham's testimony all but matched that of Rhonda's. Ingraham testified S.I. barged in demanding the items she thought were hers. Ingraham said he asked S.I. why he should give her anything considering how disrespectful she had been to him recently. Ingraham asked S.I. to leave, holding the door open for her. Once S.I. was outside, Ingraham shut the front door, but heard S.I. "cussing" him outside. At that point Ingraham stepped out on to his porch and told S.I. if she ever came back he would call the sheriff. When asked, Ingraham stated his belief that S.I. likely ripped her pants on a cattle panel he had wired to the front of the porch to address a nuisance dog. Ingraham maintained he never put his hand on S.I. or threatened to get a gun.

Finding the State's witnesses were more credible, the district court found Ingraham guilty of misdemeanor battery as charged. The court sentenced Ingraham to six months, suspended to a five-day sentence, in the county jail. The court also sentenced Ingraham to 12 months' supervised probation, ordered Ingraham to attend an anger management course, ordered Ingraham to pay for S.I.'s ripped jeans, and ordered Ingraham not to contact S.I. or any State witnesses.

ANALYSIS

In his first claim on appeal, Ingraham appears to argue that comments made by the judge during trial amounted to judicial misconduct requiring recusal. Specifically, Ingraham identifies the following three comments as judicial misconduct:

- The judge's comment that he had a granddaughter around S.I.'s age;
- The judge's comment that he would not give sympathy to Ingraham; and
- The judge's comment that Ingraham failed to take responsibility for his actions.

4

Appellate courts have unlimited review over allegations of judicial misconduct. *State v. Moyer*, 306 Kan. 342, 369-70, 410 P.3d 71 (2017). There are three substantive bases upon which a litigant may argue that a judge's recusal is required: (1) based on the statutory factors set forth in K.S.A. 20-311d(c); (2) based upon the standards of the Code of Judicial Conduct; and (3) based on the Due Process Clause of the Fourteenth Amendment to the United States Constitution. 306 Kan. at 370; see generally Kansas Code of Judicial Conduct, Supreme Court Rule 601B (2018 Kan. S. Ct. R. 425) (canons, rules, and comments guiding judge's conduct after March 1, 2009).

Under K.S.A. 20-311d(a), a party may file a motion for change of judge if the party believes that the assigned judge cannot afford that party a fair trial in the action. An affidavit in support of such a motion may allege that the judge was involved in the case as prior counsel, the judge has a personal or financial interest in the case, the judge was related to one of the parties, the judge was a material witness in the case, or that the judge has a personal bias, prejudice, or other interest in the case that renders one of the parties unable to obtain a fair and impartial trial. K.S.A. 20-311d(b) and (c).

An appellate court reviews "the particular facts and circumstances of each case to determine whether judicial comments, other than jury instructions, rise to the level of judicial misconduct." *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010). "'If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial.' [Citation omitted.]" 291 Kan. at 113. The party alleging judicial misconduct bears the burden of establishing that misconduct occurred and that the misconduct prejudiced the party's substantial rights. *State v. Hudgins*, 301 Kan. 629, 637-38, 346 P.3d 1062 (2015).

We begin our analysis by noting that each of the three comments identified by Ingraham as judicial misconduct requiring recusal were made by the judge in the context of explaining the reasons why he found the State's witnesses to be more credible than

5

Ingraham's witnesses. After the close of evidence and the arguments made by counsel, the judge noted that the State's witnesses and Ingraham's witnesses provided vastly different versions of what happened on the night in question. Due to this conflicting testimony, the judge said the outcome of the case would turn on a credibility determination by the trier of fact. The judge noted that in a bench trial like the one here, the judge is the trier of fact. At this point, the judge ruled "it is the State's witnesses that are the most credible."

After informing the parties of his decision, the judge went on to explain the reasons why he found the State's witnesses to be more credible. S.I. testified at trial that during the physical altercation with Ingraham, the new jeans she was wearing were ripped. When O'Daniel asked Ingraham about the ripped jeans during the investigation, Ingraham said he had no idea how S.I. ripped her jeans. At trial, however, defense counsel showed Ingraham a picture from S.I.'s Facebook page that showed S.I. wearing jeans that were torn. After being shown the picture, Ingraham testified that S.I. liked to wear jeans that were ripped. Later in his testimony, Ingraham speculated that perhaps S.I. ripped her new jeans on a cattle panel he had wired to the front of the porch to address a nuisance dog.

To support his finding that S.I.'s testimony was more credible than Ingraham's on the issue of the ripped jeans, the judge stated:

> "The testimony of the rip in the pants, that would be consistent with testimony saying you're slammed in the door and you're making a violent attempt to escape and, therefore, your pants would get ripped. I have a granddaughter about [S.I.'s] age. Why? But she wears clothes with rips in them. But I haven't seen any in the cheek part of the clothes that are ripped."

Taken in context, the judge was commenting on the fact that although individuals may buy and wear jeans with rips in them, the rips are not located in the buttocks area.

6

Simply put, Ingraham has failed to show the judge's comment violates any standard of the Code of Judicial Conduct or reflects a personal bias, prejudice, or other interest in the case by the judge that renders one of the parties unable to obtain a fair and impartial trial. This is especially true given the comments were made after the judge had made his decision.

The judge stating, "[Y]ou'll get no sympathy from this Court" similarly did not rise to the level of judicial misconduct. Again, the comment was made after the judge informed the parties of his decision and was meant to explain the reasons why he found the State's witnesses to be more credible than Ingraham's witnesses. Taken in its full context, this comment explains why the judge did not believe Ingraham's testimony claiming he essentially had been deprived of the ability to see his children.

> "Furthermore, the defendant trying to get up here and tell me he had no way to contact his daughters in five years. I know better. He had a divorce case. If you don't have contact with your daughters, you can pursue it through the divorce case. To just sit on your hands and say, I'm a victim, I'm a victim, I'm a victim, . . . I can't have any contact with my daughters, you'll get no sympathy from this Court."

Again, Ingraham has failed to show the judge's comment violates any standard of the Code of Judicial Conduct or reflects a personal bias, prejudice, or other interest in the case by the judge that rendered him unable to obtain a fair and impartial trial.

Finally, we look at the comments made by the judge reprimanding Ingraham for failing to take responsibility for his actions. In support of judicial misconduct, Ingraham alleges "the Court had him guilty before the Defense ever started the trial." Yet, these comments were made after the judge had made his decision and after Ingraham formally had been adjudicated guilty. The judge made these comments both before and after Ingraham had the opportunity for allocution. In deciding Ingraham's sentence, the judge was entitled to consider the fact that Ingraham refused to take responsibility for his

7

actions during the trial and the later allocution. Ingraham has failed to show the judge's comment violates any standard of the Code of Judicial Conduct or reflects a personal bias, prejudice, or other interest in the case by the judge that rendered him unable to obtain a fair and impartial trial.

In his second claim of error on appeal, Ingraham argues there was insufficient evidence to convict him of misdemeanor battery. "'When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt.'" *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). "'In making a sufficiency determination, the appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility.'" *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016).

Ingraham was charged under K.S.A. 2017 Supp. 21-5413(a)(2) which provides: "Battery is . . . knowingly causing physical contact with another person when done in a rude, insulting or angry manner." To support his argument of insufficient evidence, Ingraham points to various inconsistencies in the State's evidence. But Ingraham's arguments are no more than an invitation to reweigh evidence. The district judge expressly found the State's witnesses more credible than Ingraham's, which is a finding that cannot be disturbed on appeal. See *Dunn*, 304 Kan. at 822. Viewing the evidence in a light most favorable to the State, we conclude a rational fact-finder could have found Ingraham guilty beyond a reasonable doubt. See *Rosa*, 304 Kan. at 432-33.

Affirmed.