NOT DESIGNATED FOR PUBLICATION

Nos. 115,836
115,860

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSEPH R. HOUSWORTH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GUNNAR A. SUNDBY, judge. Opinion filed June 30, 2017. Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Michael G. Jones*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., LEBEN, J., and PATRICIA MACKE DICK, District Judge, assigned.

Leben, J.: Joseph Housworth raises several issues on appeal from his convictions in a jury trial of 12 crimes, mostly related to distributing illegal drugs. Two of Housworth's appellate claims are well taken.

First, he argues that there's insufficient evidence to support his conviction for intimidation of a witness. We agree. Intimidating a witness means dissuading a witness from testifying, and all of the evidence at trial showed that Housworth actually encouraged this witness to testify.

Second, he argues that two portions of his sentence are illegal, and here again, Housworth is correct. First, by statute, the sentence for a conspiracy or solicitation conviction should be 6 months shorter than the sentence for the underlying drug felony. But the district court sentenced Housworth to the full sentence for the underlying drug felonies. Second, 6 months can be added to a sentence if the trier of fact finds that the defendant carried a gun to commit a drug felony or possessed a gun in furtherance of a drug felony. The district court added 6 months to Housworth's sentence for distribution or possession with the intent to distribute an illegal substance near a school, but the jury made no finding that Housworth carried a gun in connection with a drug felony. The only jury verdict related to a gun was Housworth's conviction for being a felon in possession of a gun (which requires no drug felony). Since the jury didn't specifically find that Housworth carried a gun to commit a drug felony or possessed a gun in furtherance of a drug felony, the court was wrong to add 6 months to his sentence.

Housworth raises several other issues on appeal, but we have not found any of those to require reversal:

- First, he claims that two of the prosecutor's statements were improper and deprived him of a fair trial. The prosecutor suggested that Housworth should have come forward with his version of events earlier, improperly commenting on Housworth's right to remain silent. Later, the prosecutor improperly suggested that the jury could convict Housworth of conspiracy to distribute oxymorphone simply because his coconspirator had already been convicted. Neither of these comments, however, had a reasonable possibility of affecting the verdict. The implication that Housworth should have come forward earlier was just one of many avenues the prosecutor used to undermine Housworth's credibility on the stand; its standalone impact was minor. And the evidence supporting the conspiracy charge was

2

overwhelming, so the prosecutor's suggestion that the jury convict based on something other than the evidence at trial didn't impact the verdict.

- Second, Housworth argues that four of his convictions—the ones related to oxymorphone and oxycodone—aren't supported by sufficient evidence because the State was required to prove that these drugs have the addictive qualities of morphine. Housworth's argument fails as a matter of statutory interpretation. K.S.A. 2016 Supp. 21-5705(a) prohibits distributing or possessing with intent to distribute certain controlled substances, including "[o]piates, opium or narcotic drugs." Those three words are defined in K.S.A. 2016 Supp. 21-5701, and an "opiate" is a drug having the addiction-forming capability of morphine. But evidence that oxymorphone and oxycodone have addictive qualities isn't necessary to prove that they are opiates because both are listed as forms of opium in a separate but incorporated statute. The definition of "controlled substance" (also in K.S.A. 2016 Supp. 21-5701) incorporates other statutes that list types of controlled substances; one of these other statutes lists oxymorphone and oxycodone as forms of opium. K.S.A. 2016 Supp. 65-4107(b)(1)(N)-(O).

- Third, Housworth claims that three of his possession-with-intent-to-distribute convictions—those related to oxymorphone, morphine, and oxycodone—are multiplicitous. But because the statute criminalizes the possession of "any" of the listed controlled substances, the legislature intended to allow for a separate charge for each controlled substance.

- Fourth, Housworth claims that the district court should have obtained a jury-trial waiver before allowing Housworth to stipulate to his felon status because the stipulation effectively removed an element of two of the charges against him from the jury's consideration. But evidentiary stipulations are common strategic trial choices, and Kansas caselaw doesn't require a district court to give any particular warnings to a defendant before accepting such stipulations.

3

To summarize our rulings in Housworth's appeal, we reverse the conviction for intimidation of a witness but affirm the other convictions. We vacate Housworth's sentences for conspiracy and criminal solicitation. We also vacate Housworth's sentence for distributing or possessing with intent to distribute oxymorphone because the 6-month sentence enhancement was illegal. We remand the case to the district court for resentencing on the conspiracy, criminal solicitation, and possession with intent to distribute oxymorphone convictions. With that summary in hand, we move on to a detailed review of the factual and procedural background of this case along with our more complete analysis of each of the issues Housworth has raised.

FACTUAL AND PROCEDURAL BACKGROUND

There's very little dispute about most of the underlying facts of this case. Housworth lived on Miami Street in Leavenworth, Kansas, which was within 1,000 feet of Immaculata High School. When police obtained a warrant and searched Housworth's home in February 2014, they found, in Housworth's bedroom, two guns, several dozen pills, 1½ grams of methamphetamine, several hundred baggies, two digital scales, a list of likely drug users, and 18 grams of marijuana. The pills included 101 oxymorphone pills, 11 morphine pills, 93 oxycodone pills, 21½ alprazolam pills, and 21 diazepam pills.

Detective Mark Metcalf interviewed Housworth while other officers were searching his home. Metcalf testified that as soon as the officers read the search warrant to Housworth, Housworth indicated that he wanted to talk to the police. So Metcalf took Housworth to a small laundry room (away from the other people who were in the house at the time) and read him his *Miranda* rights. Housworth signed a form waiving those rights and told Metcalf where the officers would find the marijuana, methamphetamine, guns, and pills in his bedroom. Housworth told Metcalf that he sold a small amount of methamphetamine every day and that he had the guns to protect himself from being robbed. Metcalf testified that it was common for drug dealers in Leavenworth to have

4

guns for protection because the drugs dealers in the area routinely robbed each other. According to Metcalf, Housworth told him that he had the prescription pills "for women," which Metcalf understood to mean that Housworth was giving women pills in exchange for sex. At trial, a woman named Kerry Pike testified that she had been living with Housworth at the time of the search and that Housworth had provided her with oxymorphone pills in exchange for sex.

For his part, Housworth testified that he had not signed the *Miranda* waiver (and introduced his driver's license to dispute the accuracy of the signature) and had not said any of these things to Metcalf. He also questioned Kerry Pike's motivation for testifying against him and described a time that she had made a false police report against him.

Based on the search of Housworth's home, the State charged him in case No. 14-CR-112 with seven counts of distributing or possessing with the intent to distribute a controlled substance, two counts of being a felon in possession of a gun, one count of possession of drug paraphernalia, and one count of aggravated child endangerment (because a minor was in the house at the time of the search).

While Housworth was in jail awaiting trial, he made several phone calls, which were recorded, to his sons Charlie and Andrew and to his girlfriend, Elizabeth Aldridge. In one call, Housworth told Charlie to tell Andrew to look behind the bathtub and under the bottom shelf and to give Aldridge one "30" a day. Housworth asked Charlie to tell Aldridge to ration herself to half of a "30" a day. In another call, Housworth asked Andrew if he was keeping Aldridge "in medicine." Andrew replied that he only had "two more" and had limited financial resources. Later in the call, Housworth asked Aldridge to get a "front" that he would pay off when he got out of jail. Aldridge complained to Housworth that she was only getting half of a "15" each day, but Housworth told her that Andrew was supposed to give her half of a "30" each day.

5

Detective Metcalf testified at trial that keeping Aldridge "in medicine" meant giving her the oxymorphone pills that she was addicted to. He explained that a "front" referred to buying drugs on credit.

In a later call, Andrew told Housworth that Aldridge wanted to be his girlfriend; Housworth asked Andrew not to take his girl and said that Aldridge was "just sick." Andrew replied that Aldridge wasn't sick anymore because she had gotten medicine. Housworth then asked Andrew if he had gotten Aldridge high, and Andrew said she had gotten medicine from someone else.

Aldridge, while under arrest on unrelated charges, wrote a statement that was admitted at trial; in it, she said that Housworth used to give her prescription pills, specifically oxymorphone, in exchange for sex. She wrote that when Housworth went to jail, he asked Andrew to keep giving her pills, so Andrew had given her pills, again in exchange for sex.

The State also presented an audio recording of a jail visit between Housworth and Aldridge. During this conversation, Aldridge was upset because Housworth had been telling people in the Leavenworth drug community that she was a snitch and that she was the reason he was in jail. Housworth told Aldridge that he would tell everyone that she wasn't a snitch if she wrote a statement and testified that the jail phone calls were related to Andrew giving her over-the-counter sleeping pills, not prescription pills.

Based on these recordings, the State charged Housworth in case No. 14-CR-430 with conspiracy (with Charlie and Andrew) to distribute oxymorphone, solicitation (of Aldridge) to possess oxymorphone, and intimidation of a witness (Aldridge). The two cases were consolidated for trial.

6

At trial, as we noted earlier, Housworth denied speaking with Detective Metcalf while police searched his house. Housworth testified that the drugs and guns in his bedroom belonged to Aldridge—he said she had brought them into his house the evening before the search. Housworth said that he had asked Aldridge to take the drugs out of his house and had then gone to bed.

Aside from the drugs and guns, which he said were Aldridge's, Housworth provided innocent explanations for each of the other suspicious items found in his room. He said that the list of likely drug users found in his bedroom wasn't a client list; it was a list of people he had asked to stay away from his ex-girlfriend because they used drugs and were a bad influence. He said that only one of the digital scales was his and that he used it to weigh mail. He said that the plastic baggies were his ex-wife's craft supplies. Housworth testified that the jail phone calls were about over-the-counter sleeping pills that he rationed for Aldridge so she wouldn't take them all at once. Andrew testified to the same thing. But Detective Mark Doud testified that according to his research, there were no sleeping pills in 15- or 30-milligram doses available over the counter at that time.

The jury found Housworth guilty of six counts of distributing or possessing with the intent to distribute a controlled substance within 1,000 feet of a school (oxymorphone, morphine, oxycodone, alprazolam, methamphetamine, and diazepam), two counts of being a felon in possession of a gun, possession of drug paraphernalia, conspiracy to distribute oxymorphone, solicitation to possess oxymorphone, and intimidation of a witness. The jury acquitted him of possessing with the intent to distribute marijuana and of aggravated child endangerment.

For sentencing, the convictions were separately sentenced based on the underlying case in which they had been charged.

For case No. 14-CR-112, the base crime (the most serious charge) was one of the counts for distribution or possession of a controlled substance within 1,000 feet of a school. The court sentenced Housworth to 192 months in prison on that charge, which reflected the standard guideline sentence (for someone with Housworth's level of past criminal offenses) of 186 months plus 6 months for having carried a gun to commit a drug felony or having possessed a gun in furtherance of a drug felony. For the other five controlled-substance convictions, the district court sentenced him to 98 months on each offense, which was the standard guideline sentences. (The guideline sentences for non-base sentences are less because, under our sentencing guidelines, a defendant's criminal-history score is set at the lowest level—no matter the defendant's true score—for all but the base offense.) The court made the sentences on the five additional counts run concurrently with the base sentence, so the total sentence for those offenses was 192 months in prison. For the two convictions for possession of a gun as a felon, the district court sentenced Housworth to 8 months in prison on each count; the court made one of those sentences consecutive to the others, so that increased his effective sentence to 200 months in prison. The court made the sentence for possession of drug paraphernalia (11 months) concurrent, leaving the total sentence in case No. 14-CR-122 at 200 months in prison.

For case No. 14-CR-430, the base crime was a count of conspiracy to distribute oxymorphone, and the court gave Housworth a standard guideline sentence of 44 months. The court sentenced him to 11 months in prison for solicitation of the unlawful possession of oxymorphone and made that sentence consecutive, leaving a prison sentence of 55 months. The court also sentenced Housworth to 6 months in the county jail for misdemeanor intimidation of a witness, consecutive to the other sentences, but the court credited pretrial time spent in jail against that sentence, leaving the 55-month prison sentence to be served.

The prison sentences in the two cases would be served consecutively, leaving Housworth's controlling prison sentence at 255 months.

Housworth then appealed to our court.

ANALYSIS

I. *The Evidence Was Not Sufficient to Support a Conviction for Intimidation of a Witness.*

Housworth argues that the evidence at trial wasn't sufficient to support his conviction for intimidation of a witness because the evidence showed that he actually encouraged Aldridge to testify. When reviewing a challenge to the sufficiency of the evidence, since the jury convicted the defendant (thus finding in the State's favor), we consider the evidence in the light most favorable to the State and ask whether we're convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. We will not reweigh the evidence, resolve evidentiary conflicts, or make credibility determinations. *State v. Wilkins*, 305 Kan. 3, 10, 378 P.3d 1082 (2016).

Intimidation of a witness is "attempting to prevent or dissuade [a witness from giving testimony], with an intent to vex, annoy, harm or injure in any way another person or an intent to thwart or interfere in any manner with the orderly administration of justice." K.S.A. 2016 Supp. 21-5909(a). It doesn't matter whether the witness actually ends up testifying; the crime is complete when the defendant, with the required intent, commits an act to intimidate or dissuade the victim. *State v. Aguirre*, 296 Kan. 99, 106, 290 P.3d 612 (2012). Consistent with this statutory definition, the jury was instructed that to find Housworth guilty of intimidating a witness, it must find that he "attempted to dissuade a witness from attending or giving testimony at any proceeding authorized by law." While deliberating, the jury asked a question about the meaning of the word

9

"dissuade," and the district court replied with a dictionary definition: "To advise a person against something."

Even considering the evidence in the light most favorable to the State, we are not convinced that a rational factfinder could have reasonably concluded that Housworth attempted to dissuade Aldridge from testifying. In the audio recording of Housworth's conversation with Aldridge when she visited him in jail, instead of asking Aldridge not to testify, Housworth repeatedly *encourages* her to testify. It's true that he's apparently asking her to lie—to testify that the "medicine" referred to in the jail phone calls was just over-the-counter sleeping pills—but he isn't trying to keep her from testifying. And asking someone to give untruthful testimony is a different crime, known as soliciting perjury. See K.S.A. 2016 Supp. 21-5903 (defining perjury); K.S.A. 2016 Supp. 21-5303(a) (defining solicitation); *State v. Ellis*, 25 Kan. App. 2d 61, 62, 957 P.2d 520 (1998) (affirming conviction for soliciting perjury). The State didn't charge Housworth with soliciting perjury. Housworth does tell Aldridge, on the recording, that he can undo the "snitch" label if she testifies that the "medicine" was just over-the-counter sleeping pills, but even this statement encourages Aldridge to testify, not dissuades her from doing so.

During closing argument, the prosecutor mentioned this charge only once, and he didn't provide much guidance about how the evidence supported this charge:

> "Regarding the intimidation of the witness, he had labeled her as a snitch. He's accusing her of basically coming—he's accusing her of being basically—you're going to testify against me, then you're a snitch. That's pretty intimidating, as you heard from her. If you hear her on her voice, she was—she was not enjoying that."

From this, it seems that the State's theory was that Housworth attempted to dissuade Aldridge from testifying *before* the recorded jail-visit conversation took place—that he

10

tried to dissuade her from testifying by labeling her a snitch in the drug community. But there wasn't any evidence connecting the snitch name-calling to an attempt to dissuade Aldridge from testifying. Furthermore, that's not how the State charged this crime: both the complaint and the jury instruction indicate that the intimidation of a witness happened on August 4, 2014, the date of the recorded jail visit. We conclude that there wasn't sufficient evidence that Housworth tried to dissuade Aldridge from testifying for a reasonable jury to convict him of intimidation of a witness, and we therefore reverse that conviction.

II. *The District Court Erred in Sentencing When It Failed to Enter a Shorter Sentence for Conspiracy than Would Be Used for the Underlying Offense and When It Added 6 Months to Housworth's Primary Drug-Offense Sentence Based on the Use of a Gun.*

Housworth argues that two portions of his sentence are illegal.

Courts can correct an illegal sentence at any time. *State v. Fisher*, 304 Kan. 242, 264, 373 P.3d 781 (2016). A sentence is illegal when, among other reasons, it doesn't follow the applicable sentencing statutes, either in the character or the term of authorized punishment. *State v. Gray*, 303 Kan. 1011, 1014, 368 P.3d 1113 (2016). We interpret sentencing statutes independently, so we are not required to give any deference to the district court's interpretation. See *State v. Nguyen*, 304 Kan. 420, 422, 372 P.3d 1142 (2016).

Housworth's first claim is that his sentences for conspiracy and solicitation are illegal because the district court was required by statute to shorten the prison term for each of these convictions by 6 months. The State concedes that Housworth is correct on this issue, but we will briefly explain the problem with the district court's sentences.

Sentences for most felony crimes are determined based on a grid created by the legislature. The grid box at the intersection of a defendant's criminal-history score and the

11

severity of the crime is used to calculate the presumptive sentence. Each box in this grid contains three sentence options: a low number (the mitigated sentence), a mid-range number (the standard sentence), and a high number (the aggravated sentence). See, *e.g.*, K.S.A. 2016 Supp. 21-6805(a) (drug grid).

In addition, special sentencing rules apply to convictions for conspiracy and criminal solicitation, depending on the underlying crime the defendant was conspiring or soliciting someone to commit. Relevant to this case, K.S.A. 2016 Supp. 21-5302(e) and K.S.A. 2016 Supp. 21-5303(e) provide sentencing rules for a defendant convicted of conspiracy or solicitation to commit a drug-related crime. Both state that the defendant should be sentenced using the grid box applicable to the underlying drug felony *minus* 6 months. See K.S.A. 2016 Supp. 21-5302(e) ("Conspiracy to commit a felony which prescribes a sentence on the drug grid shall reduce the prison term prescribed in the drug grid block for an underlying or completed crime by six months."); K.S.A. 2016 Supp. 21-5303(e) (identical language for criminal solicitation).

In this case, Housworth was convicted of conspiracy to distribute a controlled substance and solicitation of unlawful possession of a controlled substance—both drug-related felonies. In each case, the district court should have started with the applicable grid box and then subtracted 6 months. See K.S.A. 2016 Supp. 21-5302(e); K.S.A. 2016 Supp. 21-5303(e). As the State concedes, the district court didn't do that—it simply sentenced Housworth to the mid-range number for the underlying drug felonies of distributing a controlled substance and possessing a controlled substance. Because the district court didn't follow the statutes, Housworth's sentences in 14-CR-430 on the conspiracy and solicitation convictions are illegal, and he must be resentenced for those convictions.

Housworth's second claim is that since the jury didn't specifically find that he had carried a gun to commit a drug felony or had possessed a gun in furtherance of a drug

12

felony, the district court shouldn't have added 6 months to the sentence for his primary possession-with-intent-to-distribute conviction.

Under K.S.A. 2016 Supp. 21-6805(g)(1)(A), if the trier of fact finds that a defendant carried a gun to commit a drug felony or possessed a gun in furtherance of a drug felony, then 6 months will be added to the defendant's sentence. In a jury trial, the "trier of fact" is the jury—that's who is responsible for determining the facts—not the judge. See K.S.A. 60-401(k). Housworth argues that having the judge make the finding instead of the jury would violate his constitutional right to a jury trial, citing *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), in which the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

In this case, the jury found Housworth guilty of several offenses, including two counts of being a felon in possession of a gun and six counts of distribution or possession with intent to distribute a controlled substance. Later, at sentencing, the district court added 6 months to Housworth's sentence for his primary possession-with-intent-to-distribute conviction based on K.S.A. 2016 Supp. 21-6805(g)(1)(A).

But the jury didn't make a standalone, specific finding that Housworth had carried a gun to commit a drug felony or had possessed a gun in furtherance of a drug felony. It could be argued that such a finding is implicit in the jury's verdict, which was based on Housworth's simultaneous possession of drugs and guns. And the evidence would support such a finding: A police officer testified that Housworth said he had the guns for protection and explained that drug dealers often have guns to protect themselves from being robbed. But the jury didn't specifically find that Housworth carried a gun to commit a drug felony or possessed a gun in furtherance of a drug felony; a finding of that fact wasn't required for any of Housworth's convictions. What the jury actually convicted

13

Housworth of was being a felon in possession of a handgun, which doesn't require a factual conclusion that Housworth had the guns in order to commit drug felonies, and distributing or possessing with the intent to distribute controlled substances, which doesn't require a factual conclusion that he carried or used a gun in connection with the drug offenses.

Because the statute directs that the 6-month increase must be based on a finding from the "trier of fact"—in this case, the jury—the district court wasn't free to make the finding itself. See *State v. Arnold*, No. 113,750, 2016 WL 1079487, at *4 (Kan. App. 2016) (unpublished opinion) (concluding that because defendant's no-contest plea didn't establish the fact that defendant carried a gun to commit a drug crime, the district court imposed an illegal sentence when it made such a finding and enhanced the sentence under K.S.A. 2016 Supp. 21-6805[g][1][A]), *rev. denied* April 26, 2017; see also *State v. Morales*, No. 114,223, 2016 WL 4070748, at *2-4 (Kan. App. 2016) (unpublished opinion) (concluding that because defendant's no-contest plea didn't establish the fact that defendant carried a gun to commit a drug crime, the district court's finding that defendant did carry a gun to commit a drug crime violated *Apprendi*). So the district court erred here when it added 6 months to Housworth's sentence for using a gun in connection with a drug offense.

III. *Prosecutorial Error Did Not Prejudice Housworth's Right to a Fair Trial.*

Housworth argues that we should reverse all of his convictions and remand his case for a new trial because the prosecutor committed two errors that unfairly prejudiced him and deprived him of his constitutional right to a fair trial. We review claims of prosecutorial error with a two-step analysis: error and prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). To determine whether an error has occurred, we ask whether the prosecutor's statement or conduct falls outside the wide latitude the State has to conduct its case in any manner that doesn't offend the defendant's right to a fair trial.

14

305 Kan. at 109. Then, if we find an error, we consider whether it prejudiced the defendant's right to a fair trial or if, on the other hand, it was harmless beyond a reasonable doubt. 305 Kan. at 109. To show this level of harmlessness, the State must prove that there is no reasonable possibility that the error contributed to the verdict. 305 Kan. at 109.

Housworth's first claim of error is that the prosecutor, during cross-examination, improperly commented on Housworth's silence after he received *Miranda* warnings. Housworth's lawyer objected to the prosecutor's questions, preserving this issue for appeal. See K.S.A. 60-404 (contemporaneous-objection rule).

*Miranda*, of course, provides that police must give certain warnings before interrogating a defendant in their custody. *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). One of those warnings is the now-familiar statement that a defendant has the right to remain silent and that anything he or she says can and will be used as evidence against him or her. 384 U.S. at 444. The necessary corollary to the right to remain silent is that the defendant's choice to exercise that right cannot and will not be used against him or her in court. *Doyle v. Ohio*, 426 U.S. 610, 618-19, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976); *State v. Kemble*, 291 Kan. 109, 122, 238 P.3d 251 (2010). Using a defendant's post-*Miranda* silence against him or her is generally called a "*Doyle* violation" after the United States Supreme Court case that first addressed this issue.

The rule from *Doyle* means that when a defendant testifies at trial, the prosecutor is not allowed to question the truthfulness of that testimony or undermine the defendant's credibility—a process known as "impeaching" the defendant—by implying that the defendant should have come forward earlier with this explanation. "In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently

15

offered at trial." *Doyle*, 426 U.S. at 618; see *Kemble*, 291 Kan. at 122. For example, in *Kemble*, the defendant presented a voluntary-intoxication defense at trial, telling the jury that he had been too drunk to know or remember what he was doing at the time of his crime. The prosecutor included in closing argument a PowerPoint slide that read, "'[The defendant] never said I was too drunk to remember until today.'" 291 Kan. at 121. The court found that this was a *Doyle* violation because it implied that the defendant should have come forward with this explanation earlier, which amounted to an improper comment on the defendant's post-*Miranda* silence. 291 Kan. at 122-23. The court also found that this error wasn't harmless because the outcome of the case depended on the jury's evaluation of the defendant's credibility, and the prosecutor's improper comment directly addressed the defendant's voluntary-intoxication defense. 291 Kan. at 124-25.

Similarly, in *Fisher*, 304 Kan. at 250, the court found that the prosecutor had committed a *Doyle* violation by asking the defendant whether he had ever contacted the police to give them a fuller explanation of what happened the night of the crime. The court noted that even though the defendant hadn't expressly exercised his right to silence and had actually given some post-*Miranda* statements to the police, he nevertheless hadn't been obligated to volunteer his exculpatory story (the story that he told at trial about why he wasn't guilty) to the police before trial. 304 Kan. at 250. But the court found that the error was harmless because the prosecutor also thoroughly impeached the defendant's credibility with his prior inconsistent statements, so any impact that the *Doyle* violation had on the defendant's credibility was minor by comparison. 304 Kan. at 250-51. The *Fisher* court also emphasized that while a prosecutor can't impeach a defendant with his or her post-*Miranda* silence, the prosecutor can still impeach a defendant with post-*Miranda* statements. 304 Kan. at 249.

In this case, Housworth testified that the drugs and guns founds in his bedroom weren't his; he said they belonged to Aldridge, who had brought them into his house the night before the raid to set him up. While the prosecutor was cross-examining

16

Housworth, he said, "So you've had about 18 months to get ready to testify today. How come you haven't come forward with any of this information until this morning?" This is exactly the type of question that isn't permitted by *Doyle*—even without any indication that Housworth expressly invoked his right to remain silent, he was still under no obligation to divulge testimony supporting his claim of innocence to the police or to the prosecutor before trial. See *Kemble*, 291 Kan. at 122; *State v. Clark*, 223 Kan. 83, 89, 574 P.2d 174 (1977). The prosecutor wasn't asking Housworth about a prior inconsistent *statement*, he was asking about Housworth's prior *silence*. See *Fisher*, 304 Kan. at 249. So the question was improper.

Next, the prosecutor asked why Housworth hadn't "come forward" and "ma[d]e an official report" about Aldridge's alleged lies. This question is slightly different in tone because it focuses both on Housworth's silence and on reporting someone else's crime, but it similarly implies that Housworth should have come forward earlier with some part of his testimony.

Because these questions were improper, we must turn to the second part of our test: Did the prosecutor's *Doyle* violation prejudice the jury and deprive Housworth of a fair trial, or was it harmless beyond a reasonable doubt? First, we note that while the prosecutor's questions improperly implied Housworth had exercised his right to silence, Housworth's answers rejected that implication. He answered the first question by saying that he *had* come forward with this story, to his lawyers, from the start of the case. He answered the second question by explaining that he had reported Aldridge to the police for stealing his car. So Housworth's own answers undercut any potential prejudice. Next, even though Housworth's defense at trial hinged on his credibility, any prejudice or damage to his credibility that resulted from these two improper questions was marginal at best because the prosecutor undercut Housworth's credibility in many other ways. See *Fisher*, 304 Kan. at 250-51. Among other things, the prosecutor pointed out differences between Housworth's trial testimony and his post-*Miranda* statements to police while

17

they were searching his house, questioned why Aldridge would want to set Housworth up, and suggested that Housworth wanted to pin this crime on her because she had slept with his son. We are convinced that in these circumstances, the *Doyle* violation had no reasonable possibility of contributing to the verdict.

Housworth's second claim of error is that the prosecutor, during closing argument, improperly referred to a coconspirator's conviction as evidence of Housworth's guilt on the conspiracy charge.

There's a rule in some federal and state courts that in a conspiracy case, the government cannot use a coconspirator's conviction or guilty plea as substantive evidence of the defendant's guilt. See, *e.g.*, *United States v. Whitney*, 229 F.3d 1296, 1304 (10th Cir. 2000); *United States v. Austin*, 786 F.2d 986, 991 (10th Cir. 1986); *State v. Campbell*, 296 N.C. 394, 399, 250 S.E.2d 228 (1979); *State v. Padgett*, 410 N.W.2d 143, 146 (1987). Kansas courts haven't adopted this specific rule, but it is one that developed from some basic legal concepts about what kind of evidence is admissible at trial, so we can analyze this claim of prosecutorial error—that the prosecutor used the conviction of Housworth's coconspirator as substantive evidence against Housworth—using those concepts.

Generally, evidence is admissible if it is relevant, meaning it tends to prove a material fact. See K.S.A. 60-401(b); K.S.A. 60-407(f). In a conspiracy prosecution, the conviction of a coconspirator is relevant because it's based on the same underlying facts. *United States v. Griffin*, 778 F.2d 707, 710 (11th Cir. 1985). But a district court has the discretion to exclude otherwise relevant evidence if its probative value—its value based on what it proves—is substantially outweighed by its prejudicial effect. See K.S.A. 60-445. Some federal and state courts that have weighed this issue have decided that the probative value of a coconspirator's conviction is almost always substantially outweighed by its prejudicial effect. See, *e.g.*, *Griffin*, 778 F.2d at 710. If the jury learns about the

18

coconspirator's guilty plea or conviction, it may assume that the defendant must also be guilty and that the trial is a mere formality, depriving the defendant of his right to a fair trial. *United States v. De La Vega*, 913 F.2d 861, 866 (11th Cir. 1990). If a coconspirator testifies at the defendant's trial, though, the government can introduce evidence of the coconspirator's conviction to undermine his or her credibility as a witness. *Whitney*, 229 F.3d at 1304.

That's what initially happened in this case: Andrew testified at Housworth's trial, stating that the pills discussed in the jail phone calls were over-the-counter sleeping pills, and the prosecutor introduced Andrew's conviction for conspiracy to distribute controlled substances to impeach his credibility on this point. Later, when cross-examining Housworth himself, the prosecutor asked him if he thought that everyone who had testified was lying; Housworth responded that Andrew had told the truth. So the prosecutor reminded Housworth that Andrew had already been convicted of conspiracy on these facts. Housworth's trial lawyer didn't object to either of these introductions of Andrew's conspiracy conviction, and Housworth admits on appeal that the lack of objection means he cannot challenge on appeal the actual introduction of this evidence. See K.S.A. 60-404 (requiring contemporaneous objection to evidentiary challenges); *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862 (2016).

Instead, Housworth's claim is prosecutorial error when the prosecutor mentioned Andrew's conspiracy conviction a third time, during closing argument. Housworth argues that this reference in closing argument suggested that the jury should assume Housworth was guilty of conspiracy simply because Andrew had already been convicted. Even though no objection was made to this argument at trial, Kansas courts review claims of prosecutorial error based on comments made during closing argument even when a contemporaneous objection was not made at the trial level. *State v. Roeder*, 300 Kan. 901, 932, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015).

Let's first see exactly what the prosecutor said in his closing argument about Andrew's conspiracy conviction as it related to the conspiracy charge against Housworth:

> "There [were] some conspiracy charges. These are the ones that occurred on the phone. So, for example, the one involving his son Andrew, Andrew has already been convicted of his—of having his—basically, he's already—his portion is already done.
>
> "So the fact that Mr. Housworth conspired with another person, his son, to distribute the drugs, *we know he did that because his son's already been convicted*. Your job today is determining whether or not he actually conspired with his son to—to do this crime or not. We know his son was. The question to you is, did he?" (Emphasis added.)

It's not hard to conclude that this statement was improper, based on the rules of evidence we just reviewed. The prosecutor told the jury that it should convict Housworth on the conspiracy charge because Andrew had already been convicted of it: "[W]e know he did that because his son's already been convicted." The end of the prosecutor's comments are less troubling, because there, he at least draws a clear line between Andrew's conviction and the case against Housworth: "We know his son was. The question to you is, did he?" But overall, we conclude that the prosecutor's comments fall outside the wide latitude the State has to conduct its case because, put simply, the prosecutor told the jury that it should convict Housworth because Andrew had already been convicted. See *Sherman*, 305 Kan. at 109.

We turn next to the second part of the test: Does this error require reversal of Housworth's conspiracy conviction? In our view, it does not, primarily because overwhelming evidence supported the conspiracy conviction.

The jury heard five phone calls between Housworth and his two sons. In the first, Housworth directed Charlie to tell Andrew to look behind the bathtub under the bottom shelf and to give Aldridge one of the "30s" a day and to tell Aldridge to try to ration

20

herself to half of a "30" per day. In the second, Charlie confirmed to Housworth that he had passed on the message. In the third, Housworth directed Charlie to make sure that Andrew found the "2 things" that were under the bathroom shelf. In the fourth, Housworth spoke to Andrew directly and asked him if he was "keeping [Aldridge] in medicine," and the two men had an extended conversation about how many pills (which they referred to as "15s" and "30s") had been under the shelf in the bathroom and how many pills Aldridge had been given. In a call later the same day, Housworth asked Andrew if he had gotten Aldridge high, and Andrew replied that Aldridge had gotten "medicine" from someone else. According to police testimony, the reference to keeping Aldridge in medicine meant giving her oxymorphone pills, to which she was addicted. The State also introduced a written statement from Aldridge, which said that after Housworth went to jail, he had called Andrew and asked Andrew to keep giving Aldridge her pills, and Andrew had done so.

Housworth claims that this evidence isn't overwhelming, presumably because the calls don't include the actual words "please give Aldridge oxymorphone," and he points out that both he and Andrew testified that no conspiracy occurred because the pills in question were over-the-counter sleeping pills. But the purpose of these phone calls seems obvious, despite the slightly coded language, in light of Aldridge's written statement. Additionally, a police officer specifically testified that at the time these events took place, there were no over-the-counter sleeping pills available in a 15- or 30-milligram dose—in other words, Housworth's and Andrew's version simply wasn't possible because no such over-the-counter sleeping pills existed. So even though the prosecutor should not have suggested to the jury that it could convict Housworth based on Andrew's conviction, we are convinced that there's no reasonable possibility that this error impacted the verdict.

**IV**. *The Evidence Was Sufficient to Support Housworth's Oxymorphone and Oxycodone Convictions.*

Housworth argues that the evidence was insufficient to support his four oxymorphone and oxycodone convictions because the State didn't present evidence that these two drugs meet the statutory definition of "[o]piates, opium or narcotic drugs." K.S.A. 2016 Supp. 21-5705(a)(1).

Usually, when reviewing a challenge to the sufficiency of the evidence, we consider the evidence in the light most favorable to the State and ask whether we're convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Wilkins*, 305 Kan. 3, 10, 378 P.3d 1082 (2016). But Housworth's argument actually challenges whether the evidence fits the elements of his crimes; the argument requires that we interpret criminal statutes, which we do independently and without any required deference to the district court's interpretation. *State v. Brown*, 295 Kan. 181, Syl. ¶ 6, 284 P.3d 977 (2012).

Housworth's oxycodone and oxymorphone convictions arose under two main statutes, a distribution statute and a possession statute. The distribution statute states that it's illegal to distribute or possess with the intent to distribute "any of the following controlling substances," and it then lists seven categories of controlled substances. K.S.A. 2016 Supp. 21-5705(a)(1)-(7). The State charged Housworth under the first of these categories for possessing with the intent to distribute "[o]piates, opium or narcotic drugs, or any stimulant designated in subsection (d)(1), (d)(3) or (f)(1) of K.S.A. 65-4107." K.S.A. 2016 Supp. 21-5705(a)(1). Likewise, the applicable portion of the possession statute makes it illegal to possess "any opiates, opium or narcotic drugs, or any stimulant designated in K.S.A. 65-4107(d)(1), (d)(3) or (f)(1)." K.S.A. 2016 Supp. 21-5706(a).

So the relevant portions of each statute include the same two categories of controlled substances: those listed in K.S.A. 2016 Supp. 65-4107(d)(1), (d)(3), or (f)(1); and those that are opiates, opium, or narcotic drugs. Since neither oxycodone nor oxymorphone is listed in K.S.A. 2016 Supp. 65-4107(d)(1), (d)(3), or (f)(1), for Housworth's convictions to be valid, those two substances must, by statutory definition or according to the evidence, be "[o]piates, opium or narcotic drugs." K.S.A. 2016 Supp. 21-5705(a)(1); K.S.A. 2016 Supp. 21-5706(a).

We first look for such a definition in K.S.A. 2016 Supp. 21-5701, which provides definitions that apply to both the distribution and possession statutes. But the definitions of "opiate," "opium," and "narcotic drug" included there aren't especially illuminating and don't specifically list oxycodone or oxymorphone:

> "(l) 'Narcotic drug' means any of the following . . . :
> "(1) Opium and opiate and any salt, compound, derivative or preparation of opium or opiate;
> . . . .
> "(m) 'Opiate' means any substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having addiction-forming or addiction-sustaining liability." K.S.A. 2016 Supp. 21-5701.

Housworth argues that because oxycodone and oxymorphone aren't specifically listed here, the State needed to prove that they fit into one of these definitions. See K.S.A. 2016 Supp. 21-5701(m) (defining "opiate"). For example, Housworth concedes that another of his convictions, for morphine, is valid because morphine obviously fits into the definition of "opiate" because it has the addictive qualities of morphine. But he claims that because the State didn't prove that oxycodone and oxymorphone have the addictive qualities of morphine, the evidence was insufficient to support his convictions because there wasn't any evidence that oxycodone and oxymorphone were "[o]piates, opium or narcotic drugs."

23

In our view, Housworth's interpretation is too narrow and overlooks other relevant statutes. We are required to construe separate statutes that cover the same subjects together and attempt to bring the provisions into workable harmony. *State v. Coman*, 294 Kan. 84, 93, 273 P.3d 701 (2012). And K.S.A. 2016 Supp. 21-5701(a) also includes a definition for the term "controlled substance" that in turn incorporates some related statutes: "any drug, substance or immediate precursor included in any of the schedules designated in K.S.A. 65-4105 [schedule I], *65-4107* [schedule II], 65-4109 [schedule III], 65-4111 [schedule IV] and 65-4113 [schedule V]." (Emphasis added.) This definition essentially incorporates the five schedules (or lists) of controlled substances from the Uniform Controlled Substances Act. And it's in one of those schedules—subsection (b)(1) of K.S.A. 2016 Supp. 65-4107—that we find the definitional link between the controlled-substance category of "[o]piates, opium or narcotic drugs" and the specific drugs at issue here. K.S.A. 2016 Supp. 21-5705(a)(1). This subsection lists oxycodone and oxymorphone as forms of "[o]pium and opiate." K.S.A. 2016 Supp. 65-4107(b)(1)(N)-(O). So by statutory definition, these two drugs fit into the relevant category, and the State didn't need to present any evidence about the drugs' addictive qualities. See *State v. Parrish*, No. 110,568, 2015 WL 967546, at *10 (Kan. App. 2015) (unpublished opinion) (finding that the addictive quality of hydromorphone, another opiate listed in K.S.A. 2016 Supp. 65-4701[b][1], is not an element of a drug-distribution crime).

To summarize: two criminal statutes prohibit possession and distribution of certain types of controlled substances, including a category of controlled substances described as "[o]piates, opium or narcotic drugs." K.S.A. 2016 Supp. 21-5705(a)(1); K.S.A. 2016 Supp. 21-5706(a). The possession-and-distribution statutory scheme itself doesn't list which particular drugs are part of the category "[o]piates, opium or narcotic drugs," but it does specifically incorporate an additional set of statutes—the controlled-substance statutes—that *do* list which particular drugs are part of that category. K.S.A. 2016 Supp. 21-5701(a); K.S.A. 2016 Supp. 21-5705(a)(1). These controlled-substance statutes list

24

and define many types of controlled substances, including opiates and opium. See, *e.g.*, K.S.A. 2016 Supp. 65-4105(b), (c) (schedule I, listing 79 specific forms of opiates and opium); K.S.A. 2016 Supp. 65-4107(b), (c) (schedule II, listing over 10 forms of opium and 28 specific opiates). And as we've mentioned, the particular drugs that Housworth possessed appear on one of these lists, in K.S.A. 2016 Supp. 65-4107(b)(1)(N)-(O).

Housworth argues that because the distribution and possession statutes don't specifically reference subsection (b)(1) of K.S.A. 2016 Supp. 65-4107—while they do specifically reference *other* subsections of that statute—the legislature didn't intend to criminalize distribution or possession of these types of opiates. We don't find this argument persuasive. It appears that instead of intending to exclude the controlled substances listed in K.S.A. 2016 Supp. 65-4107(b)(1) from the distribution and possession statutes, the legislature instead intended the category "[o]piates, opium or narcotic drugs" to cover a broader swath of drugs listed in various locations in the controlled-substance statutes. K.S.A. 2016 Supp. 21-5705(a)(1); see *Parrish*, 2015 WL 967546, at *10 (suggesting that the legislature also intended to cover substances that aren't specifically listed in the controlled-substance statutes but that meet the definitions provided in K.S.A. 2016 Supp. 21-5701).

So while the possession and distribution statues don't specifically reference subsection (b)(1) of the controlled-substance statute, K.S.A. 2016 Supp. 65-4107, it's enough that they reference the opiate category and rely on the controlled-substance statutes to provide greater detail. Sufficient evidence supported Housworth's convictions related to oxycodone and oxymorphone. See *Parrish*, 2015 WL 967546, at *10 (reaching the same result for hydromorphone, another drug on the list in K.S.A. 2016 Supp. 65-4107).

V. *Housworth's Oxymorphone, Morphine, and Oxycodone Convictions Are Not Multiplicitous.*

Housworth argues that three of his individual convictions for possessing with the intent to distribute different types of opiates (oxymorphone, morphine, and oxycodone) are multiplicitous, which is not allowed. We review questions of multiplicity independently, without any required deference to the district court. *State v. King*, 297 Kan. 955, 970, 305 P.3d 641 (2013); *State v. Schoonover*, 281 Kan. 453, 462, 133 P.3d 48 (2006).

Multiplicity is the charging of a single offense as more than one count on a charging document. *State v. Pham*, 281 Kan. 1227, 1246, 136 P.3d 919 (2006). That's a problem because it results in multiple punishments for a single offense, which violates the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. 281 Kan. at 1246.

Housworth didn't raise this argument below, and we generally don't consider issues that are raised for the first time on appeal. *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). There are several exceptions to this general rule, and Housworth claims that two of them apply here: (1) this is a purely legal question arising on proved or admitted facts and (2) consideration is necessary to serve the ends of justice and prevent the denial of fundamental rights. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014); see *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015) (discussing Supreme Court Rule 6.02[a][5], which requires appellant to explain why we should consider an issue raised for the first time on appeal). We agree that multiplicity presents a purely legal question in this case. See *State v. Appleby*, 289 Kan. 1017, 1026, 221 P.3d 525 (2009) (describing multiplicity issue as "purely one of law"). Further, Housworth's fundamental right to a fair trial is implicated because if his convictions are multiplicitous, then he's being punished twice for a single offense. *State v. Walker*, 283 Kan. 587, 609,

26

153 P.3d 1257 (2007) (citing *State v. Dubish*, 234 Kan. 708, 718, 675 P.2d 877 [1984]); see *State v. Weber*, 297 Kan. 805, 808-09, 304 P.3d 1262 (2013).

So we move on to the merits of Housworth's multiplicity argument. Determining whether convictions are multiplicitous has two steps. First, we ask whether the convictions arise from the same conduct. If they do, then we examine the criminal statute or statutes under which the defendant was convicted to determine whether there are two offenses or only one. *Schoonover*, 281 Kan. at 496.

To determine whether the convictions arise from the same conduct, we are to consider a variety of factors, such as whether the acts occurred at or around the same time or in the same place, as well as whether the acts were motivated by some fresh impulse. 281 Kan. at 497. Here, all of the pills were found at the same time and in the same place, and there's no evidence of a fresh impulse motivating Housworth's possession of any of them, so Housworth's convictions arise from the same conduct. *State v. Booton*, No. 113,612, 2016 WL 4161344, at *8 (Kan. App. 2016) (unpublished opinion) (finding "same conduct" where three items of drug paraphernalia were found in defendant's bedroom), *petition for rev. filed* September 2, 2016.

Since Housworth's convictions arose from the same conduct, we consider the second question. In cases like this one, involving multiple convictions under a single statute, the court must consider whether the legislature intended to permit multiple charges under the statute or intended only a single unit of prosecution. *Schoonover*, 281 Kan. at 497-98. This is called the unit-of-prosecution test, and under it the court must analyze what kind of conduct the legislature has defined as a single violation of the statute. 281 Kan. at 497-98. That conduct is a "unit of prosecution," and a person can only be convicted once for each unit. 281 Kan. at 497-98. The key is the nature of the conduct prohibited rather than the number of victims or the number of physical actions. 281 Kan. at 472.

27

Housworth was convicted under K.S.A. 2016 Supp. 21-5705(a), which makes it a crime to "distribute or possess with the intent to distribute any of the following controlled substances." The statute includes seven subsections of different kinds of controlled substances that are illegal to possess with the intent to distribute, including opiates, depressants, stimulants, hallucinogens, and anabolic steroids. See K.S.A. 2016 Supp. 21-5705(a)(1)-(7). Housworth only challenges three of his six convictions under this statute as multiplicitous, the oxymorphone, morphine, and oxycodone convictions that are based on the part of subsection (a)(1) that criminalizes possessing "[o]piates, opium or narcotic drugs" with the intent to distribute them. K.S.A. 2016 Supp. 21-5705(a)(1).

We can understand more about Housworth's argument if we start with some of the convictions he does not claim are multiplicitous. First, he doesn't claim that his oxymorphone conviction is multiplicitous of his alprazolam conviction. The oxymorphone conviction is based on subsection (a)(1), while the alprazolam conviction is based on subsection (a)(2), so he seems to concede that convictions based on different subsections of K.S.A. 2016 Supp. 21-5705(a) aren't multiplicitous. We agree on that distinction—the legislature specifically listed different subsections, which suggests that a defendant can be separately convicted of violating each of them. Next, Housworth does not claim his oxymorphone conviction is multiplicitous of his methamphetamine conviction, even though both of these convictions are based on subsection (a)(1). This subsection prohibits possessing either "[o]piates, opium or narcotic drugs *or* any stimulant designated in subsection . . . (d)(3) . . . of K.S.A. 65-4107." (Emphasis added.) K.S.A. 2016 Supp. 21-5705(a). Oxymorphone is a form of opium while methamphetamine is specifically listed in subsection (d)(3) of K.S.A. 2016 Supp. 65-4107. See K.S.A. 2016 Supp. 65-4107(b)(1)(O) (listing oxymorphone as a type of opium). So Housworth also seems to concede that convictions based on clearly delineated options within each subsection aren't multiplicitous, just like convictions based on different subsections aren't multiplicitous.

But he claims that the three convictions he does challenge (for oxymorphone, morphine, and oxycodone) are different and multiplicitous because they were all based on the same category within the same subsection—all are "[o]piates, opium or narcotic drugs" within subsection (a)(1), and more specifically, all are forms of opium. K.S.A. 2016 Supp. 21-5705(a)(1); see K.S.A. 2016 Supp. 65-4107(b)(1)(M)-(O) (listing oxymorphone, morphine, and oxycodone as forms of opium). His argument suggests that because the statute criminalizes possessing "opium" with the intent to distribute, he can only be convicted once under the statute even though he possessed three different forms of opium.

Although Housworth's argument has some logic to it, we think it focuses on the wrong portion of statutory language—the key language appears in K.S.A. 2016 Supp. 21-5705(a) itself, not in its subsections: "It shall be unlawful for any person to distribute or possess with the intent to distribute *any* of the following controlled substances." (Emphasis added.) The word "any" generally leads Kansas courts to conclude that a statute provides for multiple units of prosecution in cases involving the possession of multiple prohibited items. See *Booton*, 2016 WL 4161344, at *10; *State v. Hulsey*, No. 109,095, 2014 WL 4627486, at *11-12 (Kan. App. 2014) (unpublished opinion) (holding that the word "any" in statute criminalizing possession of child pornography supports separate convictions for multiple images), *rev. denied* 302 Kan. 1015 (2015); *State v. Odegbaro*, No. 108,493, 2014 WL 2589707, at *9 (Kan. App. 2014) (unpublished opinion) (holding that the word "any" in statute criminalizing making a false information supports separate convictions for multiple written instruments), *rev. denied* 302 Kan. 1018 (2015); *State v. Odell*, No. 105,311, 2013 WL 310335, at *8 (Kan. App. 2013) (unpublished opinion) (holding that the phrase "any item" in statute criminalizing traffic in contraband in a correctional institution provides for multiple units of prosecution). Because K.S.A. 2016 Supp. 21-5705(a) criminalizes the distribution or possession with intent to distribute "any" of the listed controlled substances, including "[o]piates, opium or narcotic drugs," and the controlled-substance statute separately lists oxymorphone,

29

morphine, and oxycodone as types of opium, Housworth's convictions for possessing oxymorphone, morphine, and oxycodone aren't multiplicitous. See K.S.A. 2016 Supp. 65-4107(b)(1)(M)-(O). Even though all three drugs fall into the same controlled-substance category, K.S.A. 2016 Supp. 21-5705(a) criminalizes possession with intent to distribute "any" of them, so possession of each drug can be charged as a separate crime.

We find further confirmation of our conclusion when we look at another example that Housworth doesn't challenge. He doesn't claim his alprazolam conviction is multiplicitous of his diazepam conviction, even though both are based on the same phrase within subsection (a)(2) that prohibits possession of depressants listed in K.S.A. 65-4111, a statute that lists both alprazolam and diazepam. See K.S.A. 2016 Supp. 65-4111(b)(1), (15). These aren't multiplicitous because K.S.A. 2016 Supp. 21-5705(a) criminalizes possession of "any" of the listed controlled substances with the intent to distribute them, subsection (a)(2) includes depressants listed in K.S.A. 2016 Supp. 65-4111, and K.S.A. 2016 Supp. 65-4111 lists alprazolam and diazepam as depressants. We can follow the same path for Housworth's oxymorphone, morphine, and oxycodone convictions. K.S.A. 2016 Supp. 21-5705(a) prohibits possession with intent to distribute "any" of the listed controlled substances, subsection (a)(1) includes "[o]piates, opium or narcotic drugs," and K.S.A. 2016 Supp. 65-4701(b)(1) (schedule II of controlled substances) lists oxymorphone, morphine, and oxycodone as types of opium. Housworth's convictions aren't multiplicitous.

VI. *The District Court Does Not Need to Obtain a Jury-Trial Waiver from a Defendant Before the Defendant Stipulates to a Fact During a Jury Trial.*

Housworth argues that we must reverse his two convictions for being a felon in possession of a firearm because he didn't waive his right to a jury trial before he stipulated to his felon status, which is one of the elements of this crime. Housworth didn't raise this issue below, but he correctly argues that we can consider a jury-waiver issue for

30

the first time on appeal because it is a purely legal question and implicates his fundamental right to a jury trial. See *State v. Rizo*, 304 Kan. 974, 978-79, 377 P.3d 419 (2016) (considering jury-waiver issue for the first time on appeal).

The Sixth Amendment to the United States Constitution provides criminal defendants with a fundamental right to have their cases tried to a jury. See *State v. Parker*, 301 Kan. 556, 563, 344 P.3d 363 (2015). In this case, of course, Housworth had a jury trial.

But at that trial, Housworth's lawyer stipulated that Housworth was a convicted felon, and this felon status was an element of the two gun-possession charges. K.S.A. 2016 Supp. 21-6304(a)(1). A stipulation is simply a "voluntary agreement between opposing parties concerning some relevant point." Black's Law Dictionary 1641 (10th ed. 2014). In other words, a stipulation tells the jury that both sides agree that a particular fact or facts are true. See *State v. Bogguess*, 293 Kan. 743, 745, 268 P.3d 481 (2012) (a defendant waives his right to contest the factual evidence included in a stipulation). So because this stipulation removed from the jury's consideration an element of a crime he'd been charged with, Housworth claims that the district court should have advised him that he was giving up his right to a jury trial on that element.

As an initial matter, we note that stipulating to felon status is commonplace and is, in fact, encouraged by the law. If a criminal defendant offers to stipulate to his or her felon status, the State and the district court must accept that stipulation. *Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997); *State v. Lee*, 266 Kan. 804, 813-15, 977 P.2d 263 (1999). This rule is a narrow exception to the general rule that the State is allowed to prove its case against the defendant "free from any defendant's option to stipulate the evidence away." *Old Chief*, 519 U.S. at 189. Without a stipulation, the State would prove a defendant's felon status by admitting court records showing a defendant's prior felony or felonies. But these records would likely include

31

details—such as what type of felony it was—that aren't relevant to determining a defendant's felon status and run the risk of unfairly prejudicing the jury against the defendant based on his or her past crimes. *Lee*, 266 Kan. at 815 ("Unless there is a dispute over the status of the prior conviction . . . the admission of the type and nature of the prior crime can only prejudice the jury."). So Housworth's stipulation in this case was common practice and a way to avoid undue prejudice *to the defendant.*

Since this stipulation is for the defendant's benefit, it's not surprising that the district court didn't warn Housworth that he was giving up some other right (the right to require the State to prove his past conviction to the jury). As a more general matter, the district court usually doesn't have to give a defendant any particular warnings before the defendant agrees to evidentiary stipulations. In *White v. State*, 222 Kan. 709, 713, 568 P.2d 112 (1977), the Kansas Supreme Court held that a bench trial on stipulated facts was not the same thing as a guilty plea and didn't require the district court to inform the defendant about rights he or she was giving up by choosing a stipulated-facts bench trial. "We know of no case or statute holding that a trial court must interrogate and advise a defendant, who is represented by counsel, before accepting and approving stipulations as to the evidence, and we are not prepared to initiate such a requirement." 222 Kan. at 713. More recently, in *Rizo*, the defendant knowingly and voluntarily waived his right to a jury trial, and the district court then held a bench trial on stipulated facts and found him guilty. The defendant argued on appeal that the district court was required to give him additional warnings (beyond the jury-waiver warnings) about the rights he gave up by stipulating to the facts. The Kansas Supreme Court disagreed, quoting *White* and holding that no additional warnings or waivers were required when a defendant chooses to proceed on stipulated facts. *Rizo*, 304 Kan. at 982-83.

In *State v. Johnson*, 53 Kan. App. 2d 734, 742, 391 P.3d 711, *petition for rev. filed* April 4, 2017, this court extrapolated from *White* and *Rizo* to address the same argument that Housworth makes here: that stipulating to felon status removed an element of the

32

crime from the jury's consideration, so a knowing and voluntary jury-trial waiver as to that element was required. The *Johnson* court concluded that a jury waiver wasn't required in these circumstances because factual stipulations generally don't require additional warnings from the court. 53 Kan. App. 2d at 742; see *State v. Brooks*, No. 113,636, 2017 WL 839793, at *6-9 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* March 30, 2017.

Like the defendants in *Johnson* and *White*, Housworth doesn't claim that he misunderstood the stipulation, that he had insufficient time to discuss it with his lawyer, that he was unaware of its effect, or that he entered into it other than knowingly and voluntarily. Nor does he claim he was coerced or victimized in any way. *White*, 222 Kan. at 714; *Johnson*, 53 Kan. App. 2d at 743. Under these circumstances, the district court was not required to obtain his waiver to a jury trial on the fact of his status as a felon before accepting a factual stipulation to that fact.

Based on the conclusions we've set out in this opinion, we reverse Housworth's conviction for intimidation of a witness; we vacate Housworth's sentence for conspiracy and criminal solicitation in 14-CR-430; we vacate Housworth's sentence for distributing or possessing with intent to distribute oxymorphone (in 14-CR-112) because the 6-month sentence enhancement was illegal; we remand for resentencing on each of the convictions for which we have vacated the sentence; and we otherwise affirm the district court's judgment.